Charles J. BROCKMEYER, Plaintiff-Respondent and Cross-Appellant-Petitioner,

v.

DUN & BRADSTREET, a foreign corporation with registered agent being C.T. Corporation System, Defendant-Appellant and Cross-Respondent.

Supreme Court

*No. 81–2024. Argued June 1, 1983.—Decided July 1, 1983.*

(Also reported in 335 N.W.2d 834.)

562

For the respondent and cross-appellant-petitioner there were briefs in court of appeals by *Kent C. Jones* and *Cape & Jones,* Milwaukee, and oral argument by *Kent C. Jones*.

For the defendant-appellant and cross-respondent there was a brief by *Reuben W. Peterson, Jr.,* and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee, and oral argument by *Reuben W. Peterson, Jr.*

Amicus curiae brief was filed by *John R. Sapp, Thomas W. Scrivner* and *Michael, Best & Friedrich,* Mil-

waukee, for The Wisconsin Association of Manufacturers & Commerce.

Amicus curiae brief was filed by *Kenan J. Kersten, Randall E. Reinhardt* and *Kersten & McKinnon,* Milwaukee, for The Wisconsin Academy of Trial Lawyers.

STEINMETZ, J. The principal issue on appeal is whether Wisconsin has any judicial exceptions to the employment at will doctrine.[1] We hold that in certain limited circumstances as discussed below, there are exceptions.

## I.

This is a review of the court of appeals decision reversing the circuit court for Milwaukee county, the Honorable Ralph G. Gorenstein. The plaintiff, Charles J. Brockmeyer, began his employment with Dun & Brad-

---

[1] Commentators have written extensively on the employment at will doctrine. The leading article is Blades, *Employment At Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power,* 67 Colum. L. Rev. 1404 (1967). Other articles include Murg and Scharman, *Employment At Will: Do the Exceptions Overwhelm the Rule?,* 23 B.C.L. Rev. 329 (1982); Peck, *Unjust Discharges From Employment: A Necessary Change in the Law,* 40 Ohio St. L.J. 1 (1979); Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute,* 62 Va. L. Rev. 481 (1976); Weyand, *Present Status of Individual Employee Rights,* N.Y.U. 22nd Annual Conference on Labor 171 (1970); Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith,* 93 Harv. L. Rev. 1816 (1980); Comment, *Termination of the At Will Employee: The General Rule and the Wisconsin Rule,* 65 Marq. L. Rev. 637 (1982); Note, *Implied Contract Rights to Job Security,* 26 Stan. L. Rev. 335 (1974); Note, *Limiting the Right to Terminate At Will—Have the Courts Forgotten the Employer?,* 35 Vand. L. Rev. 201 (1982); Comment, *Protecting the Private Sector At Will Employee Who "Blows the Whistle": A Cause of Action Based Upon Determinants of Public Policy,* 1977 Wis. L. Rev. 777.

street in August, 1969, as a business analyst trainee. From June, 1977, until his termination in May, 1980, he held a management position as district manager of the credit services division for the State of Wisconsin. Brockmeyer had no contract of employment.

Brockmeyer's career with Dun & Bradstreet as a district manager could be characterized as erratic. For a time in 1978, he was on employment probation. By improving his performance, Brockmeyer removed himself from probation. His sales ability potential was considered quite good. His income production was above average, but nevertheless, his superiors in Chicago were not satisfied with the performance of his other duties as a manager.

The events of the weekend of February 16, 1980, caused his immediate superiors some concern. They were informed that Brockmeyer, who was married but separated, was vacationing in Montana with his secretary when it was believed that he was performing his normal duties as district manager. Additional inquiries revealed that Brockmeyer had also smoked marijuana in the presence of company personnel. Supervisory personnel in Chicago sought permission from the national office to terminate or reassign Brockmeyer should they receive verification of these reports. Because of Brockmeyer's above average performance record, permission for termination or reassignment was denied. Instead, the supervisory personnel were directed to confront Brockmeyer with the information received to resolve the problem. Brockmeyer was called to a meeting in Chicago for this purpose. At that meeting he acknowledged the relationship with his secretary. He apologized for his absenteeism without notice. He admitted smoking marijuana and promised not to do it again. It was suggested at this meeting that either Brockmeyer or his secretary consider a job in another division of

Dun & Bradstreet. At the conclusion of the meeting, Brockmeyer was firmly told that he would be terminated or reassigned if existing conditions did not improve.

Brockmeyer attempted to find a position for his secretary within the company, but was unsuccessful. The Chicago office then told him that the only remaining alternative was to obtain her resignation. Her resignation was received on February 25, 1980.

Shortly thereafter, Brockmeyer's former secretary filed a sex discrimination claim against Dun & Bradstreet. In May, 1980, on a variety of separate occasions, Brockmeyer was asked by his superiors to submit a written report about the course of events which led to her resignation. Brockmeyer refused because he feared he would become Dun & Bradstreet's scapegoat for the alleged discrimination actions taken against his former secretary. He also indicated that if called to testify at a hearing or trial, he would tell the truth.

On May 27, Dun & Bradstreet settled the claim with Brockmeyer's former secretary for $12,000. Three days later, Brockmeyer was discharged. At the time of the discharge, he was offered $8,500 if he would sign a release agreeing not to sue Dun & Bradstreet. Brockmeyer refused the offer.

Brockmeyer then initiated this action alleging that he was wrongfully discharged. He also requested damages for intentional infliction of emotional harm. Dun & Bradstreet claimed that Brockmeyer was terminated for: (1) smoking marijuana in front of employees; (2) lack of attention to job duties; (3) an open affair with his secretary; and (4) low morale among employees in his office.

At trial the jury was instructed that a terminated employee can recover damages from his or her employer "where the discharge violates some clear and specific

public policies or where the discharge is retaliatory or is motivated by bad faith or malice." The jury found that Dun & Bradstreet had wrongfully discharged Brockmeyer and awarded him $250,000 in compensatory damages and $250,000 in punitive damages. The jury rejected Brockmeyer's claim for intentional infliction of emotional harm.

On appeal, the court of appeals held that: "Recovery will be permitted if termination offends clearly defined public policy, or results from the exercise of bad faith, or results from malicious or retaliatory activity on the part of the employer." 109 Wis. 2d 44, 46–47, 325 NW 2d 70 (Ct App 1982). However, the court reversed the judgment and remanded the case with instructions to dismiss the complaint on the merits because the record contained insufficient evidence to sustain Brockmeyer's claim that he was wrongfully discharged. For the reasons explained below, neither the trial court nor the court of appeals applied the proper law.

## II.

Under English common law, an employment contract for an indefinite period was presumed to extend for one year unless there was reasonable cause to discharge.[2] The English rule had evolved from the Statute of Labourers, which provided that "no master can put away his servant." Early American courts followed this approach. In the late nineteenth century, apparently influenced by the laissez-faire climate of the Industrial Revolution, the American courts then rejected the English rule and developed their own common-law rule, the

[2] For a more detailed discussion of the historical development of the at will doctrine *See* Feinman, *The Development of the Employment at Will Rule*, 20 Am. Jur. Leg. Hist. 118 (1976).

employment at will doctrine.[3] The doctrine recognized that where an employment was for an indefinite term, an employer may discharge an employee "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong."[4]

By the turn of the twentieth century, the at will doctrine was absolute and was even temporarily afforded constitutional protection.[5] However, since the New Deal government regulation in the workplace has increased dramatically as Congress and state legislatures recognized the need to curb harsh applications and abuse of the rule in an effort to stabilize labor relations.

Statutory modification of the at will doctrine can be found in a variety of federal and state laws prohibiting certain forms of discrimination. Both Title VII of the Civil Rights Act of 1964[6] and Wisconsin's Fair Employment Act, secs. 111.31–111.395, Stats., make it un-

---

[3] Commentators state that many courts were influenced by H.G. Wood's treatise on master-servant relationships published in 1877. In that treatise Wood wrote:

"With us the rule is inflexible, that a general or indefinite hiring is *prima facie* a hiring at will, and if the servant seeks to make it out a yearly hiring, the burden is upon him to establish it by proof. . . . [I]t is an indefinite hiring and is determinable at the will of either party, and in this respect there is no distinction between domestic and other servants." H. Wood, Master and Servant, sec. 134, (1877).

The commentators also generally agree that Wood's analysis was not supported by the cited authorities.

[4] Blades, 67 Colum. L. Rev. at 1405, quoting *Payne v. Western & A.R.R.*, 81 Tenn. 507, 519–20 (1884), *overruled on other grounds*, *Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134 (1915).

[5] In *Adair v. United States*, 208 U.S. 161 (1908) and *Coppage v. Kansas*, 236 U.S. 1 (1915), the United States Supreme Court held statutes that were aimed at prohibiting employers from discriminating against union members unconstitutional. The court retreated from this position in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937).

[6] 42 U.S.C. sec. 2000(e)–2 (1976).

lawful for an employer to discharge an employee because of race, color, religion, sex or national origin.[7] Similarly, the National Labor Relations Act[8] and the Wisconsin Employment Peace Act, sec. 111.06(1)(c)1, prevent discharges for union activities. Other forms of discriminatory discharges have also been prohibited by the legislature.[9]

Consistent with the philosophy of the statutory modifications, many state courts have recognized the need to protect workers who are wrongfully discharged under circumstances not covered by any legislation or whose job security is not safeguarded by a collective bargaining agreement or civil service regulations. The courts have accomplished this objective by modifying the at will doctrine. The courts have recognized both contract and tort actions under assorted legal theories. Two theories are often utilized by the courts. The adoption of either theory or both theories is urged by Brockmeyer.

[7] The Fair Employment Act also prohibits discrimination on the basis of age, handicap, marital status, ancestry, sexual orientation, and arrest or conviction record.

[8] 29 U.S.C. sec. 158 (1976).

[9] Under current Wisconsin Statutes an employer may not discharge an at will employee because:

(1) The employee was absent for jury service. Sec. 756.25(1), Stats.

(2) The employee entered the military service. Sec. 45.50, Stats.

(3) The employee's wages were garnished. Sec. 812.235, Stats.

(4) The employee refused to submit to honesty testing or because of the testing results under certain circumstances. Sec. 111.37(4), Stats.

(5) The employee was subpoenaed to testify pursuant to the Children's Code. Sec. 103.87, Stats.

(6) The employee testified at a minimum wage law enforcement proceeding. Sec. 104.10, Stats., a WEPA proceeding, sec. 111.06(1)(h), or an occupational, safety and health proceeding, sec. 101.595 (1).

(7) The employee suffered a compensable worker's compensation illness or injury under certain circumstances. Sec. 102.35(3), Stats.

The first, and the more expansive of the two theories, is imposing upon an employer an implied duty to terminate an employee only in good faith. Two cases frequently cited for this theory are *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974) and *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977). In *Monge,* a female employee was terminated because she refused to date her foreman. In *Fortune,* a salesman was discharged to avoid payment of commissions. Both courts held that the employment contract contained an implied covenant of good faith and fair dealing and that a discharge made in bad faith constituted a breach.

We refuse to impose a duty to terminate in good faith into employment contracts. To do so would "subject each discharge to judicial incursions into the amorphous concept of bad faith." *Parnar v. Americana Hotels, Inc.,* —— Hawaii ——, 652 P.2d 625, 629 (1982). Moreover, we feel it unnecessary and unwarranted for the courts to become arbiters of any termination that may have a tinge of bad faith attached. Imposing a good faith duty to terminate would unduly restrict an employer's discretion in managing the work force.

The second, and more popular of the two theories, is widely known as the "public policy exception." This theory allows the discharged employee to recover if the termination violates a well-established and important public policy.

The leading case on the public policy exception is *Petermann v. Teamsters Local 396,* 174 Cal. App. 2d 184, 344 P.2d 25 (1959). In *Petermann,* the employee was instructed by the defendant to commit perjury before a legislative committee. He was discharged when he refused. The California Court of Appeals reasoned:

"It would be obnoxious to the interests of the state and contrary to public policy and sound morality to al-

low an employer to discharge any employee . . . on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. . . . [I]n order to more fully effectuate the state's declared policy against perjury, the civil law, too, must deny the employer his generally unlimited right to discharge an employee whose employment is for an unspecified duration, when the reason for the dismissal is the employee's refusal to commit perjury." 344 P. 2d at 27.

Other states similarly recognize the public policy exception in those instances where the employee is discharged for refusing to violate a statute.[10]

Some states have applied the public policy exception when an employee was terminated for activities consistent with a legislative policy. In *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (1973), the employee was discharged for filing a workmen's compensation claim. The court noted that the state's workmen's compensation laws give employees a right to such compensation and that "If employers are permitted to penalize employees for filing workmen's compensation claims, a most important public policy will be undermined. The fear of being discharged would have a deleterious effect on the exercise of a statutory right." 297 NE2d at 427.[11]

In *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975), the Oregon Supreme Court applied the public policy ex-

---

[10] *See e.g. Harless v. First National Bank*, 246 S.E.2d 270 (W. Va. 1978) (refusing to violate a consumer credit protection law); *Trombetta v. Detroit, T&I. R.R.*, 81 Mich. App. 489, 265 N.W.2d 385 (1978) (refusing to alter state-required pollution control reports); *O'Sullivan v. Mallon*, 160 N.J. Super. 416, 390 A.2d 149 (Law Div. 1978) (refusing to perform catheterizations for which employee was not properly licensed); *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980) (insisting that employer comply with state Food, Drug and Cosmetic Act).

[11] In Wisconsin, sec. 102.35(3), Stats., prohibits an employer from unreasonably refusing to rehire an employee who has suffered a compensable worker's compensation illness or injury.

ception to the at will doctrine when the employee was discharged for complying with the statutory duty of jury service. The court allowed recovery "because of the substantial 'societal interests' in having citizens serve on juries." 536 P.2d at 516.[12]

Other states have applied the public policy exception where the discharge violates judicially conceived and defined notions of public policy, but does not necessarily contravene any explicit statutory provision. This broadest view of the public policy exception was expressed in *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 421 N.E.2d 876 (1981). In *Palmateer*, the court permitted a cause of action by an employee who had been discharged for supplying information about a fellow employee to local law enforcement authorities. The court stated: "No specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime, but public policy nevertheless favors citizen crime-fighters." 421 N.E.2d at 880.

Other states recognize the public policy exception in principle, but take a strict view of what public policies would support an action for wrongful discharge. In *Geary v. United States Steel*, 456, Pa 171, 319 A.2d 174 (1974), no relief was granted to an employee who was discharged for objecting to the marketing of a potentially defective product. The court noted that notwithstanding the employee's praiseworthy motives, no clear and compelling mandate of public policy was violated. Similar reasoning was applied in *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980). In *Pierce*, the court found no violation of a clear mandate of public policy when a physician employee was terminated for

---

[12] In Wisconsin, sec. 756.25(1), Stats., prohibits the discharge of an employee for jury service.

refusing to work on a drug research project which she contended was medically unethical.[13]

This court first recognized the at will doctrine over 100 years ago in *Prentiss v. Ledyard,* 28 Wis. 131, 133 (1871), and it was most recently affirmed in *Yanta v. Montgomery Ward & Co.,* 66 Wis. 2d 53, 63, n. 16, 224 N.W.2d 389 (1974). In *Ward v. Frito-Lay, Inc.,* 95 Wis. 2d 372, 290 N.W.2d 536 (Ct. App. 1980), the Wisconsin Court of Appeals indicated that under certain circumstances, a wrongful discharge action could be maintained. In *Ward,* the employee was discharged because his relationship with a fellow employee was causing dissension at the Frito-Lay plant. The court reviewed some of the cases that recognized the public policy exception and the implied duty to terminate in good faith and concluded that the facts of the case could not support a cause of action under either theory. This court declined to review *Ward.*

## III.

We have concluded that in the interests of employees, employers and the public, a narrow public policy exception should be adopted in Wisconsin. Accordingly,

[13] Other examples of decisions finding no violation of public policy include *Adler v. American Standard Corp.,* 291 Md. 31, 432 A. 2d 464 (1981) (no relief for employee who alleged he was fired for reporting alleged fellow employees' payment of bribes, falsification of corporate records, and misuse of corporate funds); *Keneally v. Orgain,* 606 P.2d 127 (Mont. 1980) (no relief for employee who alleged he was terminated for complaining to supervisors that company's service to consumers was inadequate).

Some states have completely rejected the public policy exception. *See Hinrichs v. Transvilaire Hospital,* 352 So. 2d 1130 (Ala. 1977); *DeMarco v. Publix Super Markets, Inc.,* 385 So. 2d 1253 (Fla. 1980); *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d (1983).

we hold that an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law.

Public policy is a broad concept embodying the community common sense and common conscience. *Merten v. Nathan,* 108 Wis. 2d 205, 213, 321 N.W.2d 173 (1982). The provisions of the Wisconsin Constitution initially declared the public policies of this state. Each time the constitution is amended, that also is an expression of public policy. In addition, public policy is regularly adopted and promulgated in the form of legislation. These declarations of public policy are inherently incorporated into every employment at will relationship.

Given the vagueness of the concept of public policy, it is necessary that we be more precise about the contours of the public policy exception. A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end.

We intend to recognize an existing limited public policy exception. An employer may not require an employee to violate a constitutional or statutory provision with impunity. If an employee refuses to act in an unlawful manner, the employer would be violating public policy by terminating the employee for such behavior. To say that the employer could be prosecuted for criminal involvement as a result of the activities would be little solace for the discharged employee.

Courts should proceed cautiously when making public policy determinations. No employer should be subject

to suit merely because a discharged employee's conduct was praiseworthy or because the public may have derived some benefit from it. *Palmateer v. International Harvester Co.*, 421 N.E.2d at 883 (1981) (Ryan, J. dissenting).

A plaintiff-employee alleging a wrongful discharge has the burden of proving that the dismissal violates a clear mandate of public policy. Unless the employee can identify a specific declaration of public policy, no cause of action has been stated. The determination of whether the public policy asserted is a well-defined and fundamental one is an issue of law and is to be made by the trial court. Once the plaintiff has demonstrated that the conduct that caused the discharge was consistent with a clear and compelling public policy, the burden of proof then shifts to the defendant employer to prove that the dismissal was for just cause.

We believe that the adoption of a narrowly circumscribed public policy exception properly balances the interests of employees, employers and the public. Employee job security interests are safeguarded against employer actions that undermine fundamental policy preferences. Employers retain sufficient flexibility to make needed personnel decisions in order to adapt to changing economic conditions. Society also benefits from our holding in a number of ways. A more stable job market is achieved. Well-established public policies are advanced. Finally, the public is protected against frivolous lawsuits since courts will be able to screen cases on motions to dismiss for failure to state a claim or for summary judgment if the discharged employee cannot allege a clear expression of public policy.

Whether the cause of action for wrongful discharge should be maintained in tort or contract or both needs

to be resolved.[14] Those cases implying a contractual term of good faith dealing sounded in contract. Most, though not all of the public policy exception cases from other states were tort actions.[15] The most significant distinction in our view between the two causes of action in wrongful discharge suits is in the damages that may be recovered. In tort actions, the only limitations are those of "proximate cause" or public policy considerations. Punitive damages are also allowed. In contract actions, damages are limited by the concepts of foreseeability and mitigation. The remedies established by the majority of Wisconsin wrongful discharge statutes are limited to reinstatement and backpay, contractual remedy concepts. We believe that reinstatement and backpay are the most appropriate remedies for public policy exception wrongful discharges since the primary concern in these actions is to make the wronged employee "whole." Therefore, we conclude that a contract action is most appropriate for wrongful discharges.[16] The contract action

---

[14] The fundamental difference between tort and contract actions lies in the nature of interests protected. Tort actions protect the interest in freedom from various kinds of harm. Contract actions protect the interest in having promises performed. There are a variety of considerations that may cause a plaintiff to prefer one action over the other. *See generally,* W. Prosser, Law of Torts, sec. 92 (4th ed. 1971).

[15] *Petermann v. Teamsters Local 396,* 174 Cal. App. 2d 184, 344 P.2d 25 (1959) is one of few decisions utilizing the public policy exception rationale that was a contract action. California now also recognizes a tort cause of action. *Tameny v. Atlantic Richfield Co.,* 27 Cal. 3d 167, 164 Cal. Rptr. 839, 610 P.2d 1130 (1980). New Jersey explicitly recognizes that both theories are appropriate in public policy exception wrongful discharge actions. *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980).

[16] *See Landwehr v. Citizens Trust Co.,* 110 Wis. 2d 716, 720, 329 N.W.2d 411 (1983) (classification of an action as a tort or contract claim can be based on considerations of fulfilling the underlying purpose of the action).

is essentially predicated on the breach of an implied provision that an employer will not discharge an employee for refusing to perform an act that violates a clear mandate of public policy. Tort actions cannot be maintained.

The defendant contends that recognizing an action for wrongful discharge usurps legislative power since modifications of the at will doctrine are a policy question within the special province of the legislature. We are well aware that the legislature has enacted a variety of statutes to prohibit certain types of discharges. However, we also believe that the legislature has not and cannot cover every type of wrongful termination that violates a clear mandate of public policy.[17]

The defendant's concern of the usurpation of legislative prerogative is overstated for two reasons. First, all declarations of public policies for purposes of the modifications of the at will doctrine must be based on constitutional or statutory grounds. By sanctioning wrongful discharge actions, we advance an already declared legislative public policy. Second, the at will doctrine is a common law principle. Almost fifty years ago this court stated:

"[W]e may not ignore the fact 'that the common law is susceptible of growth and adaptation to new circumstances and situations, and that courts have power to declare and effectuate what is the present rule in respect of a given subject without regard to the old rule. . . . The common law is not immutable, but flexible, and upon its own principles adapts itself to varying conditions.'" *Schwanke v. Garlt,* 219 Wis. 367, 371, 263 N.W. 176 (1935).

*See generally,* Currie, *The Wisconsin Supreme Court and the Common Law Tradition,* 1971 Wis. L. Rev. 818.

---

[17] Where the legislature has created a statutory remedy for a wrongful discharge, that remedy is exclusive. *See Ross v. Ebert,* 275 Wis. 523, 528, 82 N.W.2d 315 (1957).

Given the expanding role of the government in labor relations, it is entirely appropriate that the common law now recognize established constitutional and statutory policies in employment relationships.

## IV.

We now turn to the question of whether Brockmeyer's discharge violated a fundamental mandate of public policy. Brockmeyer initially contends that Dun & Bradstreet's actions violated public policy as expressed in sec. 134.01, Stats.,[18] and sec. 134.03.[19] Sec. 134.01 prohibits willfully and maliciously injuring another in his reputation, trade, business or profession. Sec. 134.03 prohibits the use of threats, intimidation, force or coercion to keep a person from working. There is no evi-

---

[18] Sec. 134.01, Stats., provides:

"134.01 Injury to business; restraint of will. Any 2 or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of wilfully or maliciously injuring another in his reputation, trade, business or profession by any means whatever, or for the purpose of maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act shall be punished by imprisonment in the county jail not more than one year or by fine not exceeding $500."

[19] Sec. 134.03, Stats., provides:

"134.03 Preventing pursuit of work. Any person who by threats, intimidation, force or coercion of any kind shall hinder or prevent any other person from engaging in or continuing in any lawful work or employment, either for himself or as a wage worker, or who shall attempt to so hinder or prevent shall be punished by fine not exceeding $100 or by imprisonment in the county jail not more than 6 months, or by both fine and imprisonment in the discretion of the court. Nothing herein contained shall be construed to prohibit any person or persons off of the premises of such lawful work or employment from recommending, advising or persuading others by peaceful means to refrain from working at a place where a strike or lockout is in progress."

dence that Dun & Bradstreet engaged in any behavior of this sort. To hold that under the facts of this case, Dun & Bradstreet violated the policies as expressed in secs. 134.01 and 134.03 would completely abolish the at will doctrine. This court intends only a recognition of stated public policy as reflected in the constitution and statutes of Wisconsin. While Dun & Bradstreet's discharge of Brockmeyer may have constituted bad faith, which is what the jury in this case presumably believed, its actions did not contravene the policies of secs. 134.01 and 134.03.

Brockmeyer next contends that he was asked to commit perjury in violation of sec. 946.31(1), Stats.[20]  The record is devoid of any evidence demonstrating that Dun & Bradstreet asked Brockmeyer to lie. Admittedly, an inference can be drawn from this record that Dun & Bradstreet was concerned over the fact that Brockmeyer would tell the truth if asked to testify at proceedings concerning his former secretary's sex discrimination claim. This inference is a far cry from the allegation that Dun & Bradstreet wanted Brockmeyer to commit perjury. There is no clearly defined mandate of public policy against discharging an employee because his testi-

---

[20] Sec. 946.31 Perjury.  (1) Whoever under oath or affirmation orally makes a false material statement which the person does not believe to be true, in any matter, cause, action or proceeding, before any of the following, whether legally constituted or exercising powers as if legally constituted, is guilty of a Class D felony:

"(a) A court;

"(b) A magistrate;

"(c) A judge, referee or court commissioner;

"(d) An administrative agency or arbitrator authorized by statute to determine issues of fact;

"(e) A notary public while taking testimony for use in an action or proceeding pending in court;

"(f) An officer authorized to conduct inquests of the dead;

"(g) A grand jury;

"(h) A legislative body or committee."

mony may be contrary to an employer's interests. Such behavior may be indicative of bad faith, but is not contrary to established public policies.

Since Brockmeyer has failed to demonstrate that his discharge violated a fundamental public policy as expressed in our constitution or statutes, we affirm the decision of the court of appeals which reversed the judgment in favor of Brockmeyer.

*By the Court.*—The decision of the court of appeals is affirmed.

DAY, J. (*concurring in result*). I concur with the result of the majority opinion affirming the court of appeals directing dismissal of Mr. Brockmeyer's complaint. However, I disagree with the majority's recognition of a cause of action for allegedly wrongful discharge in "at will" employment contracts based on "public policy" violations.

"At will" contracts are employment contracts that up to the majority opinion have no time duration and may be terminated at will by the employer or employee at any time "for any reason or for no reason."

The law in this state has been that there is no cause of action for wrongful discharge in at will employment contracts. As the late Chief Justice Horace Wilkie observed in 66 Wis. 2d 53, 63, 224 N.W.2d 389 (1974) footnote 16:

"In the absence of contrary statutory or contract provisions, an employer may discharge his employees for any reason without incurring liability therefor. *Kovachik v. American Automobile Asso.*, 5 Wis. 2d 188, 92 N.W.2d 254 (1958) ; *See also: Klug v. Flambeau Plastics Corp.*, 62 Wis. 2d 141, 148, 149, 214 N.W.2d 281 (1974) ; *Goff v. Massachusetts Protective Asso., Inc.*, 46 Wis. 2d 712, 715, 716, 176 N.W.2d 576 (1970) ; *Forrer v. Sears, Roebuck & Co.*, 36 Wis. 2d 388, 393, 153 N.W.2d 587 (1967)."

The majority has created this new right in this and the case of *Scarpace v. Sears, Roebuck & Co., et al.,* 113 Wis. 2d 608, 335 N.W.2d 844 (1983), both of whose claims are held meritless under the new rule announced by the majority.

I see no need for this addition to the legal hurdles that must be jumped over before "at will" employment contracts can be terminated. The majority opinion demonstrates that the Wisconsin legislature has been very active in this area and has set forth numerous rights that may not infringed in discharging even an "at will" employee. Federal law provides additional safeguards to employees.

The majority, recognizing that Pandora's Box may have an attractive cover, has rejected "bad faith" as giving rise to a cause of action for wrongful discharge but then has proceeded to create a new right defined as:

"A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end." P. 573.

Does "statutory provision" include the myriad of regulations that have the force of law? Does it apply to the employer who is seeking to set up a test case in order to challenge a particular statute or regulation? Does the new cause of action embrace federal as well as state constitutional provisions, statutes and regulations?

The majority says that the new rule will result in "a more stable job market . . ." P. 574. I doubt it. Most likely, more and more discharges that at present are known to be non-actionable will be vehicles to test the ingenuity of the advocate to find some constitutional,

statutory or regulatory provision that can be cited in a complaint for "wrongful discharge." Settlements will often be made of meritless claims to avoid the high cost of litigation. This will be especially burdensome to the small business person.

Is it a two-way street? May the employer sue the employee, who quits, leaving his employer at a crucial time resulting in economic loss because the employer wouldn't violate some constitutional, statutory or regulatory provision?

I would leave working out wrongful discharge rights to specific legislation covering that field and defining penalties for violation. The legislature has the advantage of being able to hold hearings, conduct investigations and determine if there are further rights that need to be created to protect the "at will" employee. Certainly neither *Scarpace* nor this case shows any need for judicial intervention.

I am authorized to state that JUSTICES WILLIAM G. CALLOW and LOUIS J. CECI join this concurring opinion.