[No. 6244–9–III.   Division Three.   November 19, 1985.]

ROBERT F. ARMSTRONG, *Appellant,* v. THE RICHLAND CLINIC, INC., P.S., *Respondent.*

*David E. Williams* and *Critchlow & Williams,* for appellant.

*Daryl Jonson* and *Cowan, Walker, Jonson & Moore,* for respondent.

MUNSON, J.—Robert Francis Armstrong appeals a judgment entered upon a jury verdict, holding his discharge from employment was not the result of discrimination. He contends: (1) the trial court erred in withdrawing certain claims from the jury; (2) the court erred in refusing his proposed instruction placing the burden of disproving discriminatory discharge upon the defendant; and (3) he was entitled to a new trial because of certain misconduct of the bailiff and the possible prejudice of a juror. We affirm.

On March 4, 1981, Mr. Armstrong filed suit against his former employer, the Richland Clinic, Inc., alleging he had been constructively discharged from employment because

of his age and past medical history in violation of RCW 49.60. The complaint further alleged the circumstances of his discharge involved the tort of outrage.

Mr. Armstrong was hired as business manager in April 1970. During the first several years of his employment, he exercised substantial control over business operations at the Clinic. However, in 1978, the physicians began increasing their participation in management partly due to increased number of physicians in the Clinic and the election of a new board of directors.

In 1979, the parties formalized their employment relationship in a written contract. It contained five paragraphs: (1) Mr. Armstrong was employed as business manager; (2) set his salary for the first year, established a bonus payment, and fringe benefits; (3) required he devote his full time to the business of the Clinic; (4) established payment of 6 months' salary in the event of disability; and (5) the contract was effective from January 1, 1980, for 1 year at which time it would be automatically renewed unless either party gave 30 days' notice prior to expiration of that year.

The Clinic had an employee manual which had been extensively revised by Mr. Armstrong in 1977. The manual provided, among other things, for layoffs of employees in the event of financial difficulties, reorganization, discontinuance or curtailment of a department project or area service, and dismissals for cause, not limited to unsatisfactory job performances.

On July 5, 1980, Mr. Armstrong suffered a heart attack and was unable to return to work until August 8, 1980. During his absence his assistant performed some of his duties while members of the board assumed other management responsibilities. He was able to work part time until he had bypass surgery on October 22, 1980, following which he returned to work on December 15, 1980.

On November 25, 1980, the Clinic gave Mr. Armstrong notice his employment contract would be terminated effective January 1, 1981; the notice also stated the Clinic was willing to discuss a new contract at his convenience. Shortly

after his return to work in December, he was given a proposed contract for the first 6 months of 1981 which included a reduction in management responsibilities as well as a reduction in salary and fringe benefits. At about the same time, his assistant was offered a contract which divided management responsibilities between her and Mr. Armstrong.

Mr. Armstrong met with the board on December 19, for the purpose of negotiating a new contract. He rejected the board's proposed contract and refused to discuss its terms. He asked that his previous contract be renewed without reduction in his management responsibilities. The board asked Mr. Armstrong to reconsider his position and requested a counterproposal from him which would include a provision for dividing management responsibilities. At a meeting on December 30, Mr. Armstrong again requested renewal of his old contract without change. The board rejected this proposal but acquiesced in his request to continue his disability benefits until January 5, 1981. Mr. Armstrong left the Clinic on December 31, 1980; this action was later instituted. A jury found no discrimination; Mr. Armstrong appealed.

Although 12 assignments of error are made, we address only the 5 issues raised in the appellant's brief. The first two are whether the court erred in refusing to instruct on his theory of implied contract of employment and implied covenant of good faith and fair dealing, which prevented discharge for other than just cause.

At the conclusion of the testimony, Mr. Armstrong moved to amend his complaint to include an implied contract and an implied covenant of good faith and fair dealing, which would have prevented his discharge for other than just cause. The court declined to grant the amendment because it was untimely and further because there was insufficient evidence to submit either theory to the jury. Assuming arguendo the court erred in not applying CR 15(b) (Amendments to Conform to the Evidence), we agree there was insufficient evidence to submit either the-

ory to the jury. *Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 533–34, 554 P.2d 1041 (1976); *Maicke v. RDH, Inc.*, 37 Wn. App. 750, 755, 683 P.2d 227, *review denied*, 102 Wn.2d 1014 (1984).

Both theories are based on the premise the employee manual applied to Mr. Armstrong. There is conflicting testimony between members of the board and Mr. Armstrong concerning applicability of the manual. However, the only testimony in support of his position is that he believed, after working on the revision of the manual and its approval by the board, it applied to him. However, an employee's subjective understanding that he will not be discharged without cause is insufficient to establish an implied agreement to that effect. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 224–25, 685 P.2d 1081 (1984); *Parker v. United Airlines, Inc.*, 32 Wn. App. 722, 727, 649 P.2d 181, *review denied*, 98 Wn.2d 1011 (1982). This is particularly true in light of the parties' formal agreement. The unambiguous language of the contract establishes Mr. Armstrong's employment was for 1 calendar year, terminable at will be either party upon 30 days' notice prior to the expiration of that time.

Similarly, the issue of an implied covenant of good faith and fair dealing is not well taken. As noted above there is nothing in the written employment contract which suggests he could only be discharged for just cause. The contract ran for 1 calendar year and was terminable by either party on 30 days' notice. As stated in *Thompson v. St. Regis Paper Co., supra* at 227–28:

> An employer's interest in running his business as he sees fit must be balanced against the interest of the employee in maintaining his employment and this exception does not strike the proper balance. We believe that
>> to imply into each employment contract a duty to terminate in good faith would . . . subject each discharge to judicial incursions into the amorphous concept of bad faith.
>
> *Parnar v. Americana Hotels, Inc.*, 65 Hawaii 370, 377, 652 P.2d 625 (1982); *accord, Brockmeyer v. Dun & Brad-*

*street*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983); *Daniel v. Magma Copper Co.*, 127 Ariz. 320, 620 P.2d 699 (Ct. App. 1980). Moreover, while an employer may agree to restrict or limit his right to discharge an employee, to imply such a restriction on that right from the existence of a contractual right, which, by its terms has no restrictions, is internally inconsistent. *Accord, Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983). Such an intrusion into the employment relationship is merely a judicial substitute for collective bargaining which is more appropriately left to the legislative process.

We find no error in the court declining to instruct on either theory proposed by Mr. Armstrong's trial amendment.

Next, Mr. Armstrong contends the court erred in declining his proposed instruction which placed upon the Clinic the burden of disproving discrimination.[1] The proposed instruction misperceives the procedural posture of the case at the time it was ready for submission to the jury. This court recognized and adopted in *Curtis v. Clark*, 29 Wn. App. 967, 969–70, 632 P.2d 58 (1981) and *Ellingson v. Spokane Mortgage Co.*, 19 Wn. App. 48, 54–55, 573 P.2d 389 (1978) the 3–step analysis of the shifting burdens enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) and its progeny. This analytical device is appropriate to motions but not

---

[1]The plaintiff's proposed supplemental instruction 1 stated:

"Under the law of the State of Washington, the right to be free from discrimination because of any sensory, mental or physical handicap is, and must be recognized as, a legislated civil right.

"The purpose of such civil right is to ensure that, to the maximum practicable extent, handicapped but qualified persons will have the right to employment.

"As a matter of law, you are instructed that plaintiff was handicapped physically because of his heart condition.

"It is for you to determine whether plaintiff was denied employment as defendant's business manager because of such handicap. In this connection, it is defendant's burden to prove some legitimate non–discriminatory reason for termination of plaintiff from the position of defendant's business manager as such position existed before plaintiff's heart attack in July of 1980.

"If you find that defendant constructively discharged plaintiff from such position and that a cause of such discharge was plaintiff's physical handicap, then your verdict shall be for the plaintiff."

instructions. *Prater v. Kent,* 40 Wn. App. 639, 644, 699 P.2d 1248 (1985). Once the case has been fully tried on the merits, the shifting burden analysis is not "the proper vehicle for evaluating a case . . .", *Williams v. Southwestern Bell Tel. Co.,* 718 F.2d 715, 717 (5th Cir. 1983) and "'the factual inquiry proceeds to a new level of specificity", *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 75 L. Ed. 2d 403, 103 S. Ct. 1478, 1482 (1983) (quoting from *Texas Dep't of Comm'ty Affairs v. Burdine,* 450 U.S. 248, 255, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)). The inquiry then is one of credibility; the issue is whether the defendant intentionally discriminated against the plaintiff. Thus, the burden of persuasion remains with the plaintiff; the proposed instruction is unnecessary. As noted in *Aikens* (quoting from *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978)), the 3–step analysis of *McDonnell Douglas* was "'never intended to be rigid, mechanized, or ritualistic" and courts should not "make their inquiry even more difficult by applying legal rules which were devised to govern 'the basic allocation of burdens and order of presentation of proof,' *Burdine,* 450 U. S., at 252, in deciding this ultimate question." *Aikens,* at 716. The court properly refused the in– struction.

▮ Mr. Armstrong next contends the court erred in not submitting his theory of actionable outrage to the jury. Mr. Armstrong bases this assignment of error on one sentence taken from *Alcorn v. Anbro Eng'g Inc.,* 2 Cal. 3d 493, 498 n.4, 468 P.2d 216, 86 Cal. Rptr. 88 (1970), *quoted in Contreras v. Crown Zellerbach Corp.,* 88 Wn.2d 735, 742, 565 P.2d 1173 (1977): "[p]laintiff's own susceptibility to racial slurs and other discriminatory conduct is a question for the trier of fact, and cannot be determined on demurrer.'" The tort of outrage involves more than the plaintiff's "suscepti-bility." As stated in *Grimsby v. Samson,* 85 Wn.2d 52, 59, 530 P.2d 291 (1975),

emotional distress must be inflicted *intentionally or recklessly*; mere negligence is not enough. Second, the

conduct of the defendant must be *outrageous and extreme. . . .* [l]iability exists "only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*"

The conduct here does not reach that magnitude; the court did not err.

Finally, Mr. Armstrong contends the court should have granted him a new trial due to "misconduct" of the bailiff and prejudice of a juror. During the initial voir dire examination by the court, this juror acknowledged on two occasions she had been a patient of one of the prospective witnesses from the Clinic and she might give greater weight to his testimony. Neither counsel inquired further of this acknowledged acquaintance and she was passed for cause.

During a recess, after the jury was impaneled, the juror asked the bailiff whether the failure to inquire further by the attorneys posed any problem. The bailiff allegedly responded that he thought it was an oversight on their part, but not to worry because many times attorneys change their minds or ask different questions of different jurors. Prior to speaking to the bailiff, she had written a note to the judge.[2] The juror acknowledged she had possession of the note, but contended she had not shown it to the bailiff during this discussion nor had it been delivered to the judge. In an affidavit the bailiff stated he had never been presented a note from this juror or any other juror requesting to speak with the judge. During a post–trial motion the court called the juror as a witness and she was examined by

---

[2]The note read:

"Sir:

"Yesterday during jury selection you asked if I knew any of the witness', lawyers, etc. I answered that I had been a patient of Dr. Stuart Freeman. Later, during 'voie dire' (sp?) neither lawyer questioned me about knowing Dr. Freeman. I wonder if this was oversight on the lawyer's part?

"I sincerely believe that my relationship with Dr. Freeman would not influence any decision of mine, but felt I should call this to your attention.

"Sincerely,

"Elizabeth Waters Goldmann"

the parties and the court. After considering the evidence before it including the juror's testimony, the court concluded the juror had not submitted the note to the bailiff, and there was no misconduct or prejudice. The trial court determines the facts concerning a claim of juror misconduct; it found none; this court is bound by that finding. *Golden Gate Hop Ranch, Inc. v. Velsicol Chem. Corp.*, 66 Wn.2d 469, 472–73, 403 P.2d 351 (1965), *cert. denied*, 382 U.S. 1025, 15 L. Ed. 2d 539, 86 S. Ct. 644 (1966); *see also Byerly v. Madsen*, 41 Wn. App. 495, 499–502, 704 P.2d 1236, *review denied*, 104 Wn.2d 1021 (1985). The court did not abuse its discretion in denying the motion.

The judgment is affirmed.

GREEN, C.J., and THOMPSON, J., concur.

Reconsideration denied December 11, 1985.

Review denied by Supreme Court February 7, 1986.