Katherine A. GOGGINS, Plaintiff-Appellant,†

v.

ROGERS MEMORIAL HOSPITAL INCORPORATED, a Wisconsin Corporation, Defendant-Respondent.

Court of Appeals

*No. 03–1087. Oral argument March 30, 2004.—Decided May 26, 2004.*

2004 WI App 113

(Also reported in 683 N.W.2d 510.)

† Petition to review denied 9-1-04.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *David E. Lasker* and *Danielle L. Carne* of *Shneidman, Hawks & Ehlke, S.C.*, Madison. There was oral argument by *David E. Lasker*.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Sarah J. Elliott* and *Daniel T. Dennehy* of *von Briesen & Roper, S.C.*, Milwaukee. There was oral argument by *Sarah J. Elliott*.

Before Brown, Nettesheim and Snyder, JJ.

¶ 1. SNYDER, J. Katherine A. Goggins appeals from an order for summary judgment in favor of Rogers Memorial Hospital Incorporated. Goggins claims relief under Wisconsin's public policy exception to the employment-at-will doctrine, and contends that the trial court erred when it determined that the facts presented did not support her claim. Goggins further contends that the court improperly characterized her claim as one for retaliatory discharge, governed by the Department of Workforce Development under Wis. Stat. § 146.997 (2001–02),[1] which deprives the court of subject matter jurisdiction. We agree that Goggins is not limited to administrative remedies provided by the DWD, but disagree with her assertion that she has

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

stated a claim for wrongful discharge. Accordingly, we affirm the order for summary judgment in favor of Rogers.

## FACTS

¶ 2. Goggins worked as a registered nurse in the Residential Eating Disorder (RED) program at Rogers beginning in 1997. At the time Goggins was hired, Dr. Thomas Holbrook was medical director for the RED program, and Dr. David Moulthrop, Ph.D., was president and CEO of Rogers.

¶ 3. When Dr. Moulthrop joined Rogers in 1993, Dr. Holbrook was medical director for the institution. Upon taking his post as president and CEO, Dr. Moulthrop removed Dr. Holbrook from his position as Rogers' medical director. As grounds for Dr. Holbrook's removal, Dr. Moulthrop cited the fact that Dr. Holbrook had just married a former patient. Dr. Moulthrop stated that he felt Dr. Holbrook's marriage to a former patient would "reflect badly on the reputation of the hospital." Dr. Holbrook agreed to step down, but he later rejoined Rogers as the medical director for the RED program and remained in that position until February 2001.

¶ 4. In July 1998, a patient, referred to as Patient A in this matter, was admitted to the RED program. She continued in residential treatment at Rogers until January 25, 1999.

¶ 5. While Patient A was in residential treatment, concerns surfaced among Rogers' staff that Dr. Holbrook was giving Patient A preferential treatment. Goggins approached Dr. Holbrook to voice her concerns about his treatment of Patient A and to inform him of the concerns circulating among the staff. Dr. Holbrook responded, "Why should I stop now?"

¶ 6. In December 1998, Goggins contacted Dr. Moulthrop about her suspicions concerning Dr. Holbrook's preoccupation with Patient A. She explained that other patients were not receiving attention from Dr. Holbrook and that Dr. Holbrook had rented a cello for Patient A. Dr. Moulthrop responded by confronting Dr. Holbrook about the allegations. Dr. Holbrook denied any inappropriate behavior, stating that Patient A's disorder required special attention.

¶ 7. Despite Patient A's discharge from the RED program in January 1999, the RED program staff continued to be concerned about Dr. Holbrook's relationship with this patient. Dr. Moulthrop arranged for the RED staff to meet with Dr. Holbrook to air their concerns. In May 1999, the RED staff met with Dr. Holbrook, where Dr. Holbrook admitted he hired Patient A to edit his book but denied having an affair with her. Just prior to this meeting, Patient A had called Dr. Moulthrop to inform him that nothing improper was happening between herself and Dr. Holbrook and she wanted the rumors stopped.

¶ 8. Following the May 1999 staff intervention with Dr. Holbrook, Goggins approached Dr. Moulthrop a second time. Goggins told Dr. Moulthrop that the consensus among staff was that Dr. Holbrook had lied at the meeting.

¶ 9. Goggins went to Dr. Moulthrop a third time in December 1999. Once again she reported information told to her by the RED staff, specifically that Dr. Holbrook had been seen in public with Patient A. Goggins stated that she was concerned about the impact Dr. Holbrook's behavior was having on the reputation of the hospital. At this meeting, Dr. Moulthrop indicated that Rogers was seeking a replacement for Dr. Holbrook.

¶ 10. On April 27, 2000, Goggins submitted a request for a twenty-eight day leave of absence to begin on May 6. She indicated two reasons for her request: (1) to pursue long-standing professional goals, and (2) to bring attention to Dr. Holbrook's questionable behavior at the RED center. Prior to the start of her leave, Goggins again met with Dr. Moulthrop. Goggins requested that the RED program manager, Elizabeth Kemppainen, attend this meeting as well. Kemppainen arrived at Dr. Moulthrop's office before Goggins, and Dr. Moulthrop told Kemppainen to leave. Kemppainen recalled that Dr. Moulthrop dismissed her, saying, "[W]e don't want to be put in a position where we have to either do something or start an investigation." At this meeting, Goggins told Dr. Moulthrop that reliable sources indicated that Dr. Holbrook was living with Patient A. Goggins further stated that she believed an immediate intervention was necessary to address Dr. Holbrook's abuse of Patient A. Dr. Moulthrop indicated that he did not want anything put in writing, and he would handle the problem.

¶ 11. Goggins began her leave of absence on May 5 and filed a complaint the next day with the State Department of Regulation and Licensing, Division of Enforcement. She wrote to the medical director of Rogers, Dr. William Watson, advising him of the problems in the RED program and the fact that she had filed a complaint. In her May 12 letter to Dr. Watson, Goggins stated: "I am writing this letter because over the past year and a half no action has been taken to stop Dr. Holbrook's abuse to his patient. On June 3rd, 2000 my LOA will be over and I will need to decide to resume my position at RED or to resign." On May 16, Goggins wrote to Dr. Watson and other members of the Rogers

administration, providing copies of all documents submitted with her complaint to the State.

¶ 12. On May 26, Goggins contacted Rogers' director of human resources, Renee Patterson, requesting an indefinite extension of her leave. She indicated that she had finished attending to her long-standing professional goals, but that the situation with Dr. Holbrook continued to be a problem. On June 2, 2000, one day before her leave of absence expired, Goggins again wrote to Patterson requesting an indefinite extension of her leave.

¶ 13. Patterson responded by letter dated June 13, 2000, and informed Goggins that her leave could not be extended as requested. Patterson invited Goggins to return to her position at the RED program by June 24 or to consider reassignment to a different program at the hospital.

¶ 14. Goggins did not accept the alternate position, nor did she return to work in the RED program by June 24.

¶ 15. In January 2001, Rogers requested Dr. Holbrook's resignation, to be effective February 28. The Department of Regulation and Licensing filed a formal complaint against Dr. Holbrook with the Medical Examining Board on March 21, 2001.

¶ 16. Goggins sued Rogers for wrongful discharge, arguing that the hospital's unwillingness to take action against Dr. Holbrook created an intolerable situation and constituted constructive discharge from her employment. She further argued that although her employment was at-will, Rogers' inaction violated public policy and therefore her termination was illegal under the public policy exception to the employment-at-will doctrine. Rogers moved for summary judgment, which was granted. Goggins appeals.

## DISCUSSION

### *Standard of Review*

¶ 17. When reviewing a summary judgment, we perform the same function as the trial court and review the matter de novo. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987). Summary judgment must be affirmed where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). When reviewing the matter, we construe all facts and reasonable inferences in favor of the nonmoving party. *Strozinsky v. Sch. Dist. of Brown Deer*, 2000 WI 97, ¶ 32, 237 Wis. 2d 19, 614 N.W.2d 443. If a determination of law will conclude the case, summary judgment should be granted. *Northwest Eng'g Credit Union v. Jahn*, 120 Wis. 2d 185, 187, 353 N.W.2d 67 (Ct. App. 1984).

### *Wrongful Discharge and Employment-at-Will*

¶ 18. Goggins was an at-will employee of Rogers. Generally, such employees may be terminated at will, for any reason or no reason, without cause and without judicial remedy for the employee. *Bammert v. Don's Super Valu, Inc.*, 2002 WI 85, ¶¶ 8–9, 254 Wis. 2d 347, 646 N.W.2d 365. An at-will employee may sue for wrongful discharge, however, where the discharge is contrary to a fundamental and well-defined public policy. *Id.*, ¶ 9.

██ ¶ 19. In asserting a wrongful discharge claim, the claimant must satisfy a two-part test: (1) the claimant must identify a fundamental and well-defined public policy sufficient to meet the narrow cause of action for wrongful discharge under the public policy exception to the employment-at-will doctrine; and (2) the claimant must demonstrate that the discharge violates that fundamental and well-defined public policy. *Strozinsky*, 237 Wis. 2d 19, ¶ 37.

### 1. The Well-Defined Public Policy

¶ 20. The starting point for our analysis is *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983). Goggins' claim relies on the public policy exception to the employment-at-will doctrine articulated by our supreme court:

> A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. An employee cannot be fired for refusing to violate the constitution or a statute. Employers will be held liable for those terminations that effectuate an unlawful end.

*Id.* at 573.

¶ 21. The public policy exception to employment-at-will is a closely guarded common law concept, and more often than not, courts have "emphasized the limited scope of the exception." *Bammert*, 254 Wis. 2d 347, ¶ 16. Substantive expansions of the public policy exception "have been few and limited in nature." *Id.*, ¶ 15. The public policy exception has been expanded to incorporate circumstances that violate the "spirit as

well as the letter" of legislative pronouncements. *Winkelman v. Beloit Mem'l Hosp.*, 168 Wis. 2d 12, 21, 483 N.W.2d 211 (1992). More recently, in *Hausman v. St. Croix Care Center*, 214 Wis. 2d 655, 571 N.W.2d 393 (1997), our supreme court concluded that the "plaintiffs' compliance with an affirmative legal duty requiring them to take action to prevent abuse or neglect of nursing home residents comports with a well-defined public policy and the rationale of our public policy exception to the employment-at-will doctrine." *Id.* at 658–59.

¶ 22. To support her claim, Goggins points to the fundamental and well-defined public policy expressed in *Hausman*, where two nursing home staff members were terminated after they reported suspected neglect and abuse of patients. *Id.* at 659–61. The *Hausman* plaintiffs were fired for complying with a legal duty to report abuse and neglect. *Id.* Goggins argues by analogy that her actions were also driven by an affirmative statutory duty, under Wis. Stat. § 940.295(3)(a), to report suspected patient abuse or neglect.[2] We agree that Goggins had a duty to report abuse or neglect of a patient, and that her actions comport with the public

---

[2] WISCONSIN STAT. § 940.295(3)(a) applies to inpatient health care facilities and states:

> (a) Any person in charge of or employed in any facility or program under sub. (2) who does any of the following, or who knowingly permits another person to do so, may be penalized under par. (b):

> 1. Intentionally abuses or intentionally neglects a patient or resident.

> 2. Recklessly abuses or recklessly neglects a patient or resident.

> 3. Negligently abuses or neglects a patient or a resident.

policy of protecting patients of health care facilities. *See Hausman*, 214 Wis. 2d at 658–59. This conclusion does not deviate from the narrow approach our courts have taken with the public policy exception, and no new public policy exception need be created in this regard.

¶ 23. There is no dispute between the parties that Rogers did respond to Goggins' reports of patient abuse and neglect. Goggins simply takes issue with the nature and extent of the response. Courts have been reluctant to "enlarge what was meant to be, and has always been, an extremely narrow exception to employment-at-will." *Bammert*, 254 Wis. 2d 347, ¶ 19. We therefore cautiously move our analysis to the second factor to determine whether Goggins has factually identified a public policy exception that is connected to the termination of her employment at Rogers.

## 2. Did Goggins' Discharge Violate Public Policy?

¶ 24. Goggins must demonstrate that she was faced with the "onerous burden of choosing between equally destructive alternatives: report and be terminated, or fail to report and be prosecuted." *Hausman*, 214 Wis. 2d at 669. The law requires a connection between the discharge and the public policy to establish a claim. *Wandry v. Bulls Eye Credit Union*, 129 Wis. 2d 37, 47, 384 N.W.2d 325 (1986).

¶ 25. We must deviate here to address a threshold issue for Goggins. An action based on a public policy exception to the employment-at-will doctrine requires a "discharge." *See Brockmeyer*, 113 Wis. 2d at 573. The parties here disagree as to whether Goggins resigned or was subject to "constructive discharge" by Rogers. The

doctrine of constructive discharge recognizes that employers, in an attempt to avoid liability, might refrain from directly firing an employee, preferring instead to engage in conduct causing the employee to resign. *Strozinsky*, 237 Wis. 2d 19, ¶ 68. To demonstrate a claim for constructive discharge, Goggins must establish that conditions at Rogers were so intolerable that she felt compelled to resign. *See id.*, ¶ 76. This "hinges on whether a *reasonable person* in the position of the plaintiff would feel forced to quit." *Id.* (emphasis added).

¶ 26. The analysis requires an "objective inquiry" into the circumstances at the time that Goggins' employment ended. *See id.* Record facts reveal that Patient A had been discharged from Rogers for over one year prior to Goggins' leave of absence in May 2000. Furthermore, Goggins described two reasons for taking her leave: (1) her concerns about Dr. Holbrook were not addressed to her satisfaction, and (2) she was taking time away to pursue her long-standing professional goals. She testified in her deposition that during her leave of absence she had advanced her outside professional goals by working on her business plan, talking to an attorney, and consulting with financial experts.

¶ 27. Also, when Goggins requested an extension of her leave, she knew that Rogers' written policy limited nonmedical leave to four weeks, and that she had been granted the maximum amount available. Goggins understood that failure to return at the end of her four-week leave would be considered a resignation. In her letter to Rogers' medical director on May 12, 2000, Goggins wrote: "On June 3rd, 2000 my LOA will be over and I will need to decide to resume my position at RED or to resign."

¶ 28. Nonetheless, Rogers extended Goggins' leave for an additional twenty days, while encouraging her to return. A letter from Rogers' director of human resources, Renee Patterson, dated June 13, 2000, stated:

> I understand that your request is primarily due to your feelings regarding the Medical Director for the Eating Disorders program. However, given your long length of service coupled with your contribution to our residents' care, I am hoping that you will reconsider our offer for you to return to your Registered Nurse position at the Eating Disorders center . . . . The Hospital will continue to hold your position until June 24th. Also, I would want to bring to your attention the fact that we have a .9, second shift, RN position available on our Odyssey unit. I would welcome your application for this position, as well as any other position with Rogers, based on your interest and qualifications.

¶ 29. Furthermore, Rogers did not prohibit Goggins from filing a complaint with the State Department of Regulation and Licensing, a remedy which turned out to be successful. Although Goggins filed her formal complaint on May 7, Rogers continued to hold her position for her, and to offer her the option of an alternate position at the hospital, until June 24.

¶ 30. The question, again, is whether a reasonable person in Goggins' position would have felt forced to quit under these circumstances. *See id*. Ultimately, whether a resignation was voluntary or coerced is a question of fact reserved for the jury. *Id.*, ¶ 72, ¶ 78. We proceed with the second portion of the analysis, recognizing that had Goggins stated a claim under the public policy exception to employment-at-will, this issue would have gone to the jury.

¶ 31. Returning to the second *Strozinsky* factor, Goggins must "identify a fundamental and well defined public policy and then prove that the discharge, whether constructive or express, violated that policy." *Id.,* ¶ 69. In other words, Goggins must show that her "termination of employment" was "for fulfillment of [her] legal obligation." *See Hausman,* 214 Wis. 2d at 669.

¶ 32. Goggins fails to demonstrate a connection between her termination of employment and the public policy goal of protecting hospital patients from abuse and neglect. This public policy consideration arose while Patient A was at Rogers and under the care of Dr. Holbrook. At that time, Goggins fulfilled her affirmative duty to report, and Dr. Moulthrop followed up on Goggins' reports. It appears that Goggins desired swifter, stronger action by Dr. Moulthrop against Dr. Holbrook. With this, Goggins departs from the fundamental and well-defined public policy articulated in her claim. Rather than arguing that she was prevented from reporting suspected abuse, she, in effect, is asking us to dictate policy on the speed and substance of an employer's investigative response. In other words, Goggins does not take issue with what Rogers did to her; she takes issue with what Rogers did not do to Dr. Holbrook.

¶ 33. Goggins continued to report her concerns to Dr. Moulthrop, and she acknowledged that Rogers never asked her to stop reporting, subjected her to any disciplinary measures, or took any retaliatory action against her. We conclude that Goggins was not placed in a "report and be terminated" situation, *see id.* at 668–69, and that the public policy exception to the employment-at-will doctrine articulated in her claim is not connected to the termination of her employment.

*Applicability of* WIS. STAT. *§ 146.997*

■■■

¶ 34. The final issue before us is Rogers' challenge to the jurisdiction of the circuit court. Under WIS. STAT. § 146.997(3), health care facilities are prohibited from taking disciplinary action against staff who report violations of law or ethical standards by their employer. Rogers argues that Goggins has essentially raised a "whistleblower" claim and is limited to recourse through the DWD. Sec. 146.997(4). We disagree. The plain language of the statute provides an employee of a health care facility with the opportunity to file a complaint with the DWD, but it is not mandatory. The statute specifically states that "any employee of a health care facility or health care provider who is subjected to disciplinary action, or who is threatened with disciplinary action, in violation of sub. (3) *may* file a complaint with the department." Sec. 146.997(4)(a) (emphasis added).

¶ 35. Our supreme court rejected the argument that individual civil actions for wrongful discharge are inappropriate because "the legislature has entrusted the State with the duty of deterring and punishing discharges that occur due to an employee's report of neglect or abuse." *Hausman*, 214 Wis. 2d at 670. The supreme court observed that "[a]bsent application of the wrongful discharge public policy exception, such an individual has no recourse to regain a former position or receive redress for a wrongful termination." *Id.*

¶ 36. We hold that Goggins had a right to pursue an individual civil action for wrongful discharge, and that she was not limited to administrative remedies under WIS. STAT. § 146.997.

## CONCLUSION

¶ 37. We conclude that Goggins' claim for wrongful discharge under the public policy exception to the employment-at-will doctrine fails to state an actionable claim. Goggins cannot demonstrate that she was discharged in connection with a recognized public policy exception to the doctrine. Although she had an affirmative duty to report patient abuse and neglect, she was not faced with the choice to "report and be terminated, or fail to report and be prosecuted." *See Hausman,* 214 Wis. 2d at 668–69. Furthermore, we conclude that Goggins had a right to pursue an individual civil claim for wrongful discharge and was not limited to administrative relief under Wis. Stat. § 146.997.

*By the Court.*—Order affirmed.