**Chris FRAMSTED, Plaintiff,**

v.

**MUNICIPAL AMBULANCE SERVICE, INC. d/b/a Amery Area Emergency Services, Wilfred Kuhl, Lee Olson, Eugene A. Sollman, David Waterman, Michael Kruschak, Jr., Jim Schmidt, Glen Wright, Jerome Anderson, Richard Van Blaricom, Ken Galewyrick, Rolf B. Bjornson, Defendants.**

No. 03–C–600–C.

United States District Court, W.D. Wisconsin.

Dec. 6, 2004.

640

Michael P. Erhard, for Plaintiff.

Peter M. Reinhardt, Bakke Norman, S.C., Menomonie, WI, Thomas A. Gilligan, Jr., Murnane, Conlin, White & Brandt, St. Paul, MN, Sally J. Ferguson, Arthur Chapman, Anne L. Johnson, Minneapolis, MN, Mark J. Gherty, Gherty & Gherty, S.C., Hudson, WI, for Defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for monetary damages brought under 42 U.S.C. § 1983. Plaintiff Chris Framsted, the former executive director of defendant Municipal Ambulance Service, Inc., contends that this defendant and the individual members of its board of directors, defendants Wilfred Kuhl, Lee Olson, Eugene A. Sollman, David Waterman, Michael Kruschak, Jr., Jim Schmidt, Glen Wright, Jerome Anderson, Richard Van Blaricom, Ken Galewyrick and Rolf Bjornson, allowed media coverage of a disciplinary hearing against him in retaliation for exercising his First Amendment right to free speech. In addition, plaintiff raises a state law claim of wrongful termination against all defendants and defamation claims against defendants Sollman and Bjornson.

Currently before the court are five motions for summary judgment, one filed by defendants Anderson and Olson, a second by defendants Schmidt and Wright, a third by defendant Van Blaricom, the fourth by

defendants Kuhl, Sollman, Waterman, Kruschak, Bjornson and Galewyrick and the fifth by defendant Municipal Ambulance Service (MAS). The motions will be granted. Plaintiff has failed to adduce evidence from which a jury could conclude reasonably that his termination of MAS employee Chris Gaetz in August 2002 was one of the reasons defendants held the first half of the October 23, 2002 board of directors meeting in open session. (Plaintiff characterizes his termination of Gaetz as the exercise of his First Amendment right of free speech and defendants do not dispute the characterization.) Plaintiff's wrongful termination claim fails because he does not allege that he was terminated for refusing to violate Wisconsin's open meetings laws. Finally, defendants Bjornson and Sollman are entitled to summary judgment on plaintiff's defamation claims. Plaintiff qualifies as a limited purpose public figure and he has failed to show that either defendant Bjornson or defendant Sollman acted with malice. Moreover, defendant Bjornson's statement was an opinion for which there was no implication of an undisclosed defamatory fact and it is undisputed that defendant Sollman did not make the communication to which plaintiff objects.

From the parties' proposed findings of fact, I conclude that the following are material and undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Chris Framsted has been an emergency medical technician since approximately 1991. He was employed as the manager of defendant Municipal Ambulance Service, Inc., d/b/a/ Amery Area Emergency Medical Service, from September 1, 1998 through October 29, 2002. As manager, plaintiff was responsible for the

day-to-day operations of defendant MAS and he reported directly to its board of directors.

Defendant MAS is a non-stock Wisconsin corporation with its principal place of business in Amery, Wisconsin. According to its bylaws, its purpose is to provide emergency and non-emergency medical services throughout its member municipalities, which include the city of Amery and seven Wisconsin towns. Defendant MAS receives its operating revenue from two sources: some from payments by or on behalf of those who use the service and the remainder from the member municipalities on a per capita basis.

Pursuant to the bylaws, defendant MAS is governed by a board of directors composed of the mayor of Amery (or the mayor's designee from Amery's City Council), the chairperson of each member town's board, the chairperson of the Amery Regional Medical Center (or the chairperson's designee from the center) and an emergency medical technician from MAS. The Board was to meet at least quarterly in January, April, July, and October and each member had voting rights. At all relevant times, defendant Wilfred Kuhl was the chairman of the board of directors and the representative of the town of Lincoln; defendants Lee Olson, Eugene Sollman, David Waterman, Jim Schmidt, Glen Wright and Jerome Anderson represented the towns of Garfield, Clear Lake, Apple River, Clayton, Beaver and Alden respectively. Defendant Michael Kruschak, Jr., is the chief executive officer of the Amery Regional Medical Center and was appointed to the board of directors in April 2000. Defendant Richard Van Blaricom has been the fire chief for the city of Amery for more than twenty years and began volunteering as an emergency medical technician with defendant MAS in 1987. In 1999, he was elected as the EMT represen-

tative on the board of directors. None of the board members were compensated for serving on the board.

Defendant Dr. B. Rolf Bjornson is a family physician employed by the Amery Regional Medical Center. He was the medical director of defendant MAS from 1990 through the end of 1999, when plaintiff asked him to step down as medical director. Defendant Dr. Kenneth L. Galewyrick is a family physician employed at the Amery medical center.

When plaintiff began his employment, defendant MAS had only one other full time employee, Shelly Stinnett (now Shelly Gaetz), and fourteen to eighteen paid volunteers. During plaintiff's tenure, defendant MAS hired two additional full-time emergency medical technicians, Benedict Gaetz and Nicki Schad.

In January 2001, defendant MAS's employee handbook was revised to make clear that employment with defendant MAS is at-will; an employee may resign at any time with or without cause and defendant MAS may terminate any employee at any time with or without cause so long as the termination would not violate state or federal law. Plaintiff received a copy of the handbook and understood that his employment was at-will.

### B. The D–50 Incident

In the fall of 2001, plaintiff volunteered to drive one of defendant MAS's ambulances in Amery's Fall Festival Parade. Schad and Gaetz rode in the ambulance during the parade. Schad told Gaetz in plaintiff's presence that she been out drinking the night before, was feeling ill and wanted to be hydrated by intravenous administration of fluids. Plaintiff attached a bag of saline to an intravenous needle and after a failed attempt by Gaetz, ran the needle into a vein in Schad's hand. Shortly thereafter, Gaetz administered D–

50, a controlled drug typically used to treat low blood sugar levels for insulin dependent diabetics. Plaintiff did not know that Gaetz had given Schad D–50 until later.

### C. *Zero Intoxication Policy*

Between 1998 and March 2002, plaintiff confronted defendant Van Blaricom (the Amery Fire Chief) about the fire department's "zero intoxication" policy, under which firefighters were permitted to consume alcohol on fire station premises but could not drive fire station vehicles if they were intoxicated. Plaintiff told defendant Van Blaricom that the "zero intoxication" policy was not good enough and that the department needed a "zero tolerance" policy, prohibiting firefighters from consuming alcohol on fire station premises. Plaintiff made these statements after observing intoxicated firefighters at emergency scenes on numerous occasions. On one occasion, defendant Van Blaricom had asked plaintiff to drive a fire truck because none of the firefighters were fit to do so.

In March 2002, plaintiff told Rick Davis, a member of Amery's city council, about his concerns regarding the zero intoxication policy. Davis brought up plaintiff's concerns at a meeting of the Amery public safety committee. After some discussion, the committee members, including Davis, directed defendant Van Blaricom to enforce a zero tolerance policy. Defendant Van Blaricom did not enforce the new policy until the late summer or early fall of 2002.

### D. *Gaetz's Termination*

After EMT Gaetz had two surgeries on one of his fingers and began experiencing back pain, his physician, Dr. McCoy, prescribed him painkillers. From approximately 1996 through 2002, Gaetz had been attending Alcoholics Anonymous and had been clean and sober. In January 2002, plaintiff appointed Gaetz to be defendant MAS's training officer, responsible for holding the required monthly continuing education training sessions for defendant MAS's emergency medical technicians. At some point during the first eight months of 2002, Gaetz relapsed and began consuming alcohol with the prescribed pain killers.

In August 2002, plaintiff believed that Gaetz had come to work under the influence of drugs or alcohol on at least one occasion. Plaintiff arranged an intervention; it was unsuccessful. When Gaetz refused to enter an inpatient treatment program, plaintiff asked for his resignation. Gaetz relinquished his pager and portable radio and left the station but called plaintiff five minutes later to rescind his resignation. Plaintiff told Gaetz that he was terminated. Approximately twenty minutes later, Gaetz returned to the station, denying that he had ever reported to work under the influence of any intoxicating substance. When Gaetz refused plaintiff's request that he submit to a drug and alcohol test, plaintiff informed him that his termination remained effective.

Plaintiff informed defendant MAS's board of directors that he had terminated Gaetz for failure to perform his duties as training officer, failure to submit to a drug and alcohol test and failure to comply with the reasonable accommodations that were made conditions of his employment after his admission of addiction to drugs and alcohol. Plaintiff wrote Gaetz to confirm the termination, identifying Gaetz's substance abuse problem and refusal to enter an inpatient treatment as the reason. In mid-August 2002, MAS's board of directors discussed Gaetz's termination. Gaetz's informed the board of extenuating circumstances preventing him from entering the in-patient treatment program plaintiff had insisted upon. The board asked plaintiff whether he thought Gaetz ought to be given a second chance in light of these extenuating circumstances he may not

have previously been aware of and plaintiff answered affirmatively. The board voted unanimously to reinstate him, subject to random drug testing.

On September 25, 2002, plaintiff called a meeting with Gaetz and defendant Kuhl (MAS board chairman) to advise Gaetz that plaintiff believed that Gaetz's attitude over the previous weeks had created an unhealthy and hostile work environment and that his continued employment was in serious question. Plaintiff issued Gaetz a verbal reprimand.

### E. October 10, 2002 Letter

By way of a letter dated October 10, 2002, plaintiff informed defendant MAS's board of directors that he had drafted a grievance policy for MAS employees. Plaintiff asked board members to instruct any MAS employee raising a complaint to follow the grievance policy. Under plaintiff's drafted policy, an employee with a complaint about another employee, operational concerns or any other matter would first report it to plaintiff either verbally or in writing. In addition, plaintiff indicated that in light of certain unspecified "incidents and statements made by Dr. McCoy" in the preceding month, plaintiff had contacted Dr. Craig Johnson, requesting the assignment of a new medical director.

### F. Van Blaricom's Termination

In 2002, each member municipality subsidized defendant MAS with a payment of $8 for each of its residents. Facing an anticipated decrease in payments from the Medicare and Medicaid programs, in September 2002, plaintiff wrote each member of the MAS board of directors who was an elected official representing a member municipalities, proposing an increase in the per capita subsidy rate to $11. In the letter, plaintiff said that it would not be possible to have a budget meeting until November 2002.

When defendant Van Blaricom (the Amery Fire Chief) learned of plaintiff's plan to propose a subsidy rate increase, he began to question plaintiff's financial management of MAS. On September 29, 2004, defendant Van Blaricom asked plaintiff for copies of certain financial information relevant to MAS's proposed budget for 2003. Plaintiff refused, suggesting that defendant Van Blaricom ask defendant Kruschak (board member and CEO of the Amery Medical Center) for a copy of the letter that plaintiff had sent to board members regarding the budget earlier in the month.

In a letter to plaintiff dated October 3, 2002, defendant Van Blaricom put his request for financial documents in writing. Defendant Van Blaricom asked for certain documents used in preparing the 2003 budget proposal, reflecting plaintiff's compensation and showing long distance calls made from defendant MAS's cellular telephones. Upon receiving this letter, plaintiff contacted defendant Olson (a board member), who suggested that plaintiff seek the advice of a lawyer.

Plaintiff called a lawyer and sent him a follow-up letter dated October 7, 2002, seeking legal advice. The lawyer whom plaintiff contacted informed plaintiff that terminating defendant Van Blaricom was not without risk because he might be able to successfully assert a wrongful discharge claim. On October 21, 2002, plaintiff contacted defendant Van Blaricom, insisting that the two meet sometime that day. Defendant Van Blaricom refused to meet with plaintiff.

Defendant Olson instructed plaintiff to terminate defendant Van Blaricom. Plaintiff drafted a memorandum setting forth the following reasons for defendant Van Blaricom's termination: threatening plaintiff with contacting another service about

providing ambulance services in the area, threatening plaintiff with felony obstruction charges for not providing Van Blaricom with documents he did not have a right to have, raising his voice and cursing at plaintiff in a disrespectful manner and falsely accusing plaintiff of using MAS funds for personal expenditures and of destroying MAS records. Plaintiff engaged a police officer to serve Van Blaricom with "termination papers" at his home that evening.

### G. *October 22, 2002 EMT Meeting*

On October 8, 2002, Gaetz sent a letter to all of defendant MAS's emergency medical technicians, informing them of a training session scheduled for October 22, 2002. Shortly after learning of defendant Van Blaricom's termination, Gaetz decided to move the October 22 meeting to his house because a number of the medical technicians wanted to discuss their concerns about plaintiff's management after the training session. Gaetz and some of the other technicians called all MAS emergency medical technicians to insure that they all knew about the move and that the subject of plaintiff's management would be discussed immediately after the training session.

On October 21, 2002, EMTs Gaetz, Stinnett and Schad met with board chairman Kuhl at the MAS station and informed him that defendant MAS's emergency medical technicians were threatening to quit unless their concerns were addressed.

Twenty-seven people attended the October 22 meeting at Gaetz's house. After the training session, all non-MAS employees were asked to leave. For the next hour, the emergency medical technicians discussed their problems with plaintiff's management and what they would like to see fixed. Ultimately, they decided to write individual letters to the board members. Gaetz called defendant Sollman

(MAS board member) about the problems and informed him that a number of MAS employees had complaints about plaintiff's management style and that the full-time employees were going to quit unless they were heard by the board. Sollman directed Gaetz to have the employees put their complaints in writing so that he could present them to the board. After speaking with Gaetz, defendant Sollman called defendant Kuhl (MAS board chairperson) and suggested that the board meet to hear the complaints.

### H. *October 23, 2002 Board Meeting*

The morning after the training session at Gaetz's house, plaintiff suspended Gaetz pending investigation of the meeting. About two hours later, defendant Kuhl called plaintiff and informed him that a special meeting had been scheduled for 1:00 p.m. that afternoon to give the employees an opportunity to express their concerns. Prior to this date, all special meetings of the board had been publicly noticed forty-eight hours in advance. Plaintiff told defendant Kuhl that he anticipated that he would be "put in front of a firing squad" at the meeting; defendant Kuhl assured him that the meeting would be closed and his rights would not be violated.

Just before the meeting began, several board members gathered in plaintiff's office to discuss whether the meeting should be open or closed. Defendant board members Schmidt and Wright did not attend this "pre-meeting." After plaintiff reiterated his concern that he would be put before a firing squad, he understood that the meeting would be closed. At this pre-meeting, defendant Sollman was adamant that the meeting should be held in open session.

Every member of the board and approximately ten of defendant MAS's emergen-

cy medical technicians attended the meeting. Defendant Bjornson (MAS's former medical director) attended at Gaetz's request to explain the medical uses of D–50 if necessary. Defendant Galewyrick (Amery Medical Center physician) attended the meeting on behalf of Dr. McCoy, who was out of town that day. Also in attendance were two representatives from the local media: Jerry Sondreal from the *Amery Free Press* and an individual from WXCE, a local radio station owned by defendant Van Blaricom's son. WXCE tape recorded the meeting and later created a transcript.

### 1. *Open session*

Defendant Kuhl opened the meeting by asking that everyone present be respectful and refrain from making personal attacks. Next, defendant Sollman inquired whether the meeting would be open or closed and suggested that it be closed unless everyone agreed that it should be open. Typically, discussions about personnel matters were held in closed session. Defendant Kuhl responded by indicating that the meeting would start in open session and would be closed if the board deemed it necessary. The first substantive issue addressed was the recent termination of defendant Van Blaricom and suspension of Gaetz. Both Gaetz and defendant Van Blaricom indicated that they had no objections to the discussion of their personnel matters in open session. Plaintiff was given an opportunity to present his reasons for taking these actions and defendant Van Blaricom and Gaetz each had a chance to justify his own allegedly improper behavior. Next, defendant Sollman questioned plaintiff about why he had contacted lawyers on behalf of defendant MAS without board approval. Plaintiff deferred to board member Olson, who acknowledged advising plaintiff to contact a lawyer on behalf of defendant MAS and defended making that decision unilaterally.

Following this discussion, defendant Sollman said that he had received a number of phone calls from MAS employees, expressing concern about the ability of MAS to continue operating under current conditions. Defendant Sollman asked to hear from the employees about their specific concerns. Gaetz responded by providing Sollman with a stack of letters written by various MAS emergency medical technicians, setting forth their objections to plaintiff's management. These letters included complaints that plaintiff took an inordinate amount of paid vacation time, was rude and insensitive to grieving persons while on service calls, instructed some employees to falsify reports, referred to board members as "dumb fucking farmers," engaged in various acts of sexual harassment and threatened to retaliate against any employee who brought any of the foregoing to the attention of the board.

After presenting these letters, Gaetz said that he spoke on behalf of all of the MAS emergency medical technicians, even those not present. First, he said that plaintiff was in the habit of lying to the board. Next, Gaetz said that the screensaver on plaintiff's work computer depicted a topless woman, that plaintiff had told Stinnett that he would like to see her naked and that he told new employees that MAS was an equal opportunity employer and they should expect to be sexually harassed. Gaetz then discussed the D–50 incident, although he indicated that it was plaintiff who had introduced the drug into the saline bag. Plaintiff spoke up to say that it had been Gaetz who introduced the D–50. Schad responded by accusing plaintiff of being responsible for the D–50 and not Gaetz.

Next, board member Sollman addressed chairman Kuhl, saying that the board

might want to hear about the allegations that Stinnett had made in her letter. (Defendant Sollman had read the letter at the time he made this suggestion.) Defendant Kuhl suggested that some of the allegations ought to be read in closed session and Gaetz objected, saying that Stinnett would not have a fair opportunity to have her concerns addressed. Plaintiff noted that as a personnel matter, the allegations should be discussed with the board. Ultimately, Kuhl allowed Gaetz to read the letter in open session, but directed him to "take out a couple of things. Don't read all five pages of it." Immediately thereafter, the following exchange took place:

> SOLLMAN: Here's one that I have definite concerns about as far as the administration of our book work here for the ambulance service.
>
> KUHL: That, I will accept.
>
> SOLLMAN: (Reading from Stinnett's letter) "Being in the office with [plaintiff], I have seen him shred numerous documents. He has even shred insurance checks because he doesn't pay any attention to what he is doing." And then it goes . . . well maybe that one is a little more personal I suppose. She mentions in here about "you will be sexually harassed." Ah . . . oh, God I cannot . . . you have to hear this. You have to hear this, because this was made in public. "At one point we were sitting at a football game in the ambulance. We had a fourteen year old female Explorer with us, and as a young female walked by the ambulance, [plaintiff] said, [plaintiff] stated that she would look good" . . . I can't read this.
>
> STINNETT: She'd look good with my balls on her chin is what he said in front of this fourteen year old (inaudible).
>
> KUHL: They're inappropriate statements, we all know that.

> GAETZ: It's not only unappropriate [sic], sir. It's unprofessional and it's teaching a fourteen year old child . . . what? That this is, EMTs are perverts. I'm sorry, but I respect my profession much more than that.
>
> SOLLMAN: I can't believe this.

After this exchange, someone asked for an opinion about the seriousness of the D–50 incident, which defendant Bjornson supplied. Defendant Bjornson said that he doubted that plaintiff was permitted to administer D–50 without higher authority and that he wasn't sure whether plaintiff was allowed to start an I.V. on a nonpatient but added that either way, he didn't think it was ethically appropriate. Defendant Bjornson asked for and was granted permission to make the following additional statement:

> Because, I find this whole thing incredibly disturbing and just kind of looking at the big picture here. I have worked with all these people very closely as an emergency room physician. I know and respect the quality and work ethic of all of these EMTs, and I don't exclude [plaintiff] from that. We as a community depend on this service and these are people, we're not talking about a bunch of rabble-rousers here, I mean these are people who are willing to give of their lives to an enormous degree. . . . I'm concerned when a group, when the vast majority of the group are having this degree of conflict with the manager. The manager's role is not to be liked by everyone but it's certainly, one would anticipate, to be respected and clearly there is a total loss of respect here, and if what I'm hearing, if these allegations are correct, I can understand that. Clearly, this is dysfunctional. We depend on this group of people and [plaintiff] I guess if enough people are telling

you that you are a [horse/rat],[1] look around to see if you have a tail. I mean, I think that we have to listen to what these people are saying.

Next, Gaetz told a story about an occasion when he and plaintiff had responded to a call involving a woman who had shot herself to death. According to Gaetz, plaintiff said "I bet I could buy a .357 really cheap right now," while the owner of the gun was standing within earshot. After Gaetz told this story, Kari Clark, another MAS emergency medical technician, said that the employees had been having these concerns for years, that they had always been dismissed by plaintiff or the board, that the situation had become unbearable and that she believed plaintiff lied to the employees. Clark concluded by suggesting that the board should take the word of the employees because of the number of people all saying the same things. Defendant Kuhl announced that the board was going into closed session but first granted Schad permission to tell the board that plaintiff had threatened the jobs of any employee who attended the special board meeting. Up to that point, none of the defendants had moved to close the meeting. The open session ended with Gaetz's stating that all but three of the emergency medical technicians would not work for plaintiff in the future.

### 2. *Closed session*

At the beginning of the closed session, which was attended only by plaintiff and the board, plaintiff asked defendant Kuhl to permit certain individuals plaintiff had invited to the meeting to speak to the board on his behalf. Defendant Kuhl denied the request on the ground that it

would be inappropriate to allow directors from other ambulance services to give their opinions on how things operate in a different situation. Plaintiff responded by characterizing the accusations against him as "BS" and saying that defendant Kuhl was looking to the wrong people.

After some more conversation regarding the validity of the bylaws, defendant Sollman indicated that he had heard that plaintiff had implemented the new grievance procedures and that he objected to plaintiff's having done so without first obtaining board approval. Next, defendant Van Blaricom expressed his disapproval of the way plaintiff handled Van Blaricom's request for certain financial records and plaintiff's characterization of the request as a "threat." In addition, defendant Van Blaricom said that he disapproved of the circumstances surrounding his dismissal. Defendant Sollman expressed his belief that the MAS employees had lost confidence in plaintiff.

After being invited to speak by defendant Kuhl, defendant Galewyrick noted that defendant MAS had done well under plaintiff's leadership for the past four years. However, he went on to point out that the employees who were now expressing dissatisfaction with plaintiff had been "on his side" for most of that time. Defendant Galewyrick noted that he found it alarming that people who had worked with plaintiff for a long time were now saying that they could no longer work with him. Defendant Galewyrick concluded with the following remarks:

> Even if none of the things [said] were true, I don't know that we can go on with that. Because you can't have a manager that people don't have confi-

---

1. Plaintiff has testified that defendant Bjornson used the word "rat," defendant Bjornson has sworn that he used the word "horse." Because the difference is not material, defen-

dants have stipulated that defendant Bjornson used the word "rat" for purposes of resolving these motions. Br. Dft. Kuhl et al., dkt. # 38, at 30.

dence in and we can't replace the service. So the fact that things have deteriorated to the point that you have a manager that people have said they won't work for regardless of what the board does, it's a lose-lose situation.

Defendant Kuhl then suggested that the board "let the matter sit for now," but plaintiff said that if there is a decision to be made, the board should make it immediately. Defendant Sollman then suggested that plaintiff be suspended and that an interim manager be appointed pending the board meeting scheduled for October 29, 2002. After defendant Sollman made this suggestion, defendant Kuhl asked defendant Van Blaricom to step out of the closed meeting. Defendant Van Blaricom did so and did not participate in the board's decision making that evening. After defendant Van Blaricom left, the remaining board members discussed the MAS employees' loss of confidence in plaintiff. One of the board members said that nobody was suggesting that plaintiff had not done a good job in many instances but that the "issue is [that] he has done some things that are not right and he's lost the confidence of some of the board at least and he has lost the confidence of the people that work for him and we're soon going to loose the confidence of the people in the community."

When defendant Kuhl called for action on the motion to suspend plaintiff, plaintiff asked for and was granted permission to speak. Plaintiff told the board that it should terminate the dissident employees instead of suspending him. He said he could re-build the operation and attain the same quality of service. Ultimately, the board decided to suspend plaintiff until the October 29 board meeting. Plaintiff turned in his pager, cellular telephone and keys at the end of the closed session.

### I. *Plaintiff's Resignation*

Shortly after the special meeting, plaintiff secured other employment in Colorado. While in Colorado to sign "new hire paperwork," plaintiff retained the services of attorney Carol Dittmar. Plaintiff attended the October 29 board meeting with Dittmar, who tendered plaintiff's resignation on his behalf. At or shortly after the October 29 meeting, the board reinstated Gaetz and Van Blaricom and appointed Stinnett as the interim director. At some later date, the board increased the per capita subsidy to $11, as plaintiff had urged.

### OPINION

#### A. *First Amendment Retaliation*

The First Amendment provides public employees with limited protection when their employer retaliates against them for engaging in expressive conduct. *Abrams v. Walker,* 307 F.3d 650, 654 (7th Cir.2002); *Hulbert v. Wilhelm,* 120 F.3d 648, 650 (7th Cir.1997). A retaliatory act is actionable under § 1983 even if the act itself would have been proper had it been taken for other reasons. *Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987).

In order to establish a prima facie case of First Amendment retaliation, plaintiff must demonstrate that (1) his speech was a matter of public concern; and (2) his conduct was a substantial or motivating factor in the defendants' actions. *Spiegla v. Hull,* 371 F.3d 928, 935 (7th Cir.2004). If plaintiff makes this showing, the burden shifts to defendants to show that the government's interest as an employer in efficiently providing public services outweighs plaintiff's First Amendment interest or that defendants would have taken the alleged retaliatory act anyway. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977);

*Gustafson v. Jones,* 290 F.3d 895, 906 (7th Cir.2002).

### 1. *Scope of plaintiff's claims*

Before turning to the merits of plaintiff's claim, I must address the parties' dispute regarding the scope of plaintiff's claim. In his first complaint, plaintiff alleged that defendants refused to hold the October 23, 2002 meeting in closed session in retaliation for plaintiff's speaking out about the need for professionalism and discipline at MAS, disciplining Gaetz for having violated the drug policy and terminating defendant Van Blaricom for insubordination. Plt.'s Cpt., dkt. # 36, at ¶¶ 65 and 68. In his response to the five motions for summary judgment filed by defendants, plaintiff identifies two acts of speech on which he bases his claim: (1) speaking out against defendant Van Blaricom's no intoxication policy; and (2) enforcing defendant MAS's zero tolerance policy by firing Gaetz for rejecting an attempted intervention. Plt.'s Resp. Br., dkt. # 54, at 20. Defendants object to plaintiff's reliance on his speech regarding defendant Van Blaricom's no intoxication policy. According to defendants, plaintiff did not inform them that this speech was part of his claim until August 30, 2004, after plaintiff's deposition had been taken and two days before the deadline for filing dispositive motions.

■ Defendants are correct; plaintiff failed to make this speech part of his First Amendment retaliation claim. Aside from the tardiness of plaintiff's supplemental interrogatory answer, plaintiff has not met the pleading requirements of Fed.R.Civ.P. 8(a) with respect to this speech. Although a plaintiff need not allege a chronology of events from which retaliation may be inferred, *Walker v. Thompson,* 288 F.3d 1005, 1009 (7th Cir.2002), he must state those "bare minimum facts necessary to put the defendant on notice of the claim so

that he can file an answer." *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir.2002) (citing *Beanstalk Group, Inc. v. AM General Corp.,* 283 F.3d 856, 863 (7th Cir. 2002)). In the retaliation context, the bare minimum facts include the allegedly protected conduct and the retaliatory act. *Id.* ("Had Higgs merely alleged that the defendants had retaliated against him for filing a suit, without identifying the suit or act or acts claimed to have constituted retaliation, the complaint would be insufficient.")

Nowhere in plaintiff's complaint did he allege that he had spoken out against defendant Van Blaricom's no intoxication policy. He never amended his complaint to add such an allegation. He has cited no authority suggesting that interrogatory answers can materially alter claims. *Cf. Griffin v. Potter,* 356 F.3d 824, 830 (7th Cir.2004) (plaintiff may not amend complaint through arguments in brief in opposition to a motion for summary judgment); *Whitaker v. T.J. Snow Co.,* 151 F.3d 661, 664 (7th Cir.1998) (same). In any event, this pleading deficiency has not harmed plaintiff; there is not a scintilla of evidence suggesting that plaintiff's speech against the no intoxication policy had anything to do with defendants' decision to hold the first half of the October 23 meeting in open session.

Second, although plaintiff identified his termination of defendant Van Blaricom as allegedly protected speech in his complaint, he has not developed any argument with respect to it in his brief. Plt.'s Br., dkt. # 54, at 20. Thus, I will treat this portion of plaintiff's claim as waived. *Central States, Southeast and Southwest Areas Pension Fund,* 181 F.3d 799, 808 (7th Cir.1999) ("Arguments not developed in any meaningful way are waived.").

Although plaintiff did not make it clear in his complaint that he was contending

that defendant retaliated against him because he had asked defendant Bjornson to step down as medical director in 1999 and because he had proposed an increase of the per capita subsidy payments, he stated in interrogatory answers that he was making such a claim. In their motions for summary judgment, defendants argue that this speech was not protected and not one of the reasons for their actions. Because plaintiff has not argued that these acts of speech were part of his claim, that they are protected under the First Amendment or that they motivated any of defendants' actions, he has waived these claims to the extent that he ever asserted them. Thus, the only remaining speech at issue is the termination of defendant Gaetz.

Finally, with respect to the alleged retaliatory act, several defendants appear to have assumed that the alleged retaliatory conduct in this case was the decision to suspend plaintiff pending the next board meeting. Br. of Dfts. Kuhl et al., dkt. # 38, at 22; Dft. MAS's Br., dkt. # 44, at 12. In his response brief, plaintiff explains that the alleged retaliatory conduct in this case is defendants' failure to hold the entirety of the October 23 meeting in closed session. Plt.'s Br., dkt. # 54, at 25–26. Plaintiff identified this act in his complaint as the retaliatory act on which he based his First Amendment retaliation claim. Plt.'s Cpt., dkt. # 2, at ¶¶ 55 ("The decision of the MAS [b]oard of [d]irectors to conduct the 'special meeting' as a public meeting and to permit it to deteriorate into a 'public lynching' was driven by one or more members of the MAS [b]oard of [d]irectors … to retaliate against Framsted ….") and 68.

■ (In its reply brief, defendant MAS argues for the first time that holding the meeting in public is not sufficiently adverse to be actionable. Arguments raised for the first time in a reply brief are deemed waived. *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir.1998). In any event, defendant MAS's argument is premised on the "adverse employment action" standard applicable under Title VII. Dft. MAS's Br., dkt. # 61, at 4 (citing *Russell v. Board of Trustees of University of Illinois at Chicago*, 243 F.3d 336, 341 (7th Cir. 2001) (analyzing claim under Title VII)). The degree of adversity required in First Amendment retaliation claims brought under 42 U.S.C. § 1983 is substantially lower. *Bart v. Telford*, 677 F.2d 622, 625 (in First Amendment case, act is sufficiently adverse if it would deter person of ordinary firmness from exercising protected right).)

2. *Actions "under color of state law"*

Plaintiff's retaliation claim is brought under 42 U.S.C. § 1983, which creates a federal cause of action for "the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." According to defendants, defendant MAS is not a public entity but a corporation; therefore, there is no action under color of state law. In defense of his claim, plaintiff argues that (1) defendant MAS was established pursuant to the member municipalities' state law obligation to insure the availability of ambulance service, Wis. Stat. § 60.565; (2) eight of the ten board members are elected officials serving as representatives of their respective municipalities; (3) member municipalities are ultimately responsible for defendant MAS's financial obligations; and (4) the per capita subsidy provides a substantial portion of defendant MAS's operating funds.

■ The "under color of law" requirement in § 1983 is analyzed under the same standard applied to "state action" questions under the Fourteenth Amendment.

*Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (citing *United States v. Price,* 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)). In the Fourteenth Amendment context, it is well-settled that "[c]onduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). In a recent case analyzing the "state action" requirement, the Supreme Court acknowledged that "[w]hat is fairly attributable [to the state] is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition for finding state action; nor is any set of circumstances absolutely sufficient . . . ." *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 295–96, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001).

In *Brentwood,* the court concluded that the actions of the defendant interscholastic athletic association were attributable to the state, despite the association's nominally private character, because of "the pervasive entwinement of public institutions and public officials in its composition and workings." *Id.* at 298, 121 S.Ct. 924. The Court based its conclusion on its findings that 84% of the association's members were public school officials, that when public school officials represent their schools in the association, they act in their official capacities, that interscholastic athletics play an integral part in the state's public education system, that some organization is necessary to provide interscholastic sports, that about half of the board meetings were held during school hours and that the association received at least some funding from membership fees. *Id.* at 299, 121 S.Ct. 924.

■ The facts in this case are analogous. Defendant MAS is the creation of entities that are themselves creatures of state law. Four-fifths of the board members are elected officials. Although defendants argue that the municipal representatives act in their capacity as private individuals and not as elected officials, their argument is difficult to reconcile with the fact that these defendants would not be eligible to serve on the board were they not members of the municipal governments. Moreover, it is undisputed that each of these defendants acted as a representative of his respective municipality. *Brentwood,* 531 U.S. at 299, 121 S.Ct. 924 ("Although the findings and prior opinion in this case include no express conclusion of law that public school officials act within the scope of their duties when they represent their institutions, no other view would be rational."). Because plaintiff challenges the decision to hold the meeting in open session, it is significant that the decision was made by defendant Kuhl, one of the elected officials who served as a board member.

Next, insuring the availability of ambulance services is not only an integral but a required function of a municipality. Wis. Stat. § 60.565. Moreover, defendants do not deny that defendant MAS owes its existence to this state law mandate. The fact that it could not operate on user fees alone suggests that private enterprise would not be profitable in the area. Finally, defendant MAS receives substantial monetary support through the per capita assessments. Although the per capita payments supply a minority share of the total financing, the member municipalities are ultimately responsible for defendant MAS's financial obligations and would pay

the majority share should user fees diminish to less than half of the operating costs.

In *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), the Court found that the National Collegiate Athletic Association was not a "state actor" under the Fourteenth Amendment. Tarkanian brought suit against the association after the University of Nevada had suspended him as its basketball coach pursuant to the Association's rules and recommendations. The Court concluded that because the association was composed of several hundred member institutions, most of which had no connection to Nevada law, its actions could not be attributed to the state. However, the Court noted in dicta that "[t]he situation would, of course, be different if the [Association's] membership consisted entirely of institutions located within the same sovereign." *Tarkanian*, 488 U.S. at 193 n. 13, 109 S.Ct. 454; *see also Brentwood*, 531 U.S. at 298, 121 S.Ct. 924 (distinguishing *Tarkanian* on basis of this dicta). This distinction foreshadows the result in this case because defendant MAS's member municipalities are all auxiliaries of the state of Wisconsin.

Because the member municipalities are so entwined in the establishment, operation, management and finances of defendant MAS, the actions of both defendant MAS and its board members in their official capacities must be considered to have been taken "under color of state law" for purposes of § 1983.

### 3. *Public concern*

█ Defendants' next challenge is to the protected status of plaintiff's speech. As noted above, the only "speech" involved in this case is plaintiff's termination of Gaetz pursuant to defendant MAS's no tolerance drug policy. (Because none of the parties have objected to the characterization of plaintiff's action, I will assume for the purpose of deciding this motion that termination qualifies as a type of communicative conduct entitled to protection as "speech" under the First Amendment. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) ("speech" encompasses nonverbal communication and expressive conduct). Whether an employee engaged in protected speech is a question of law to be decided by the court, *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir.2000); *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir.1999), and is governed by the analytical framework set out in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). An employee must first show that he engaged in speech that is a matter of public concern, *Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir.2003); *McGreal v. Ostrov*, 368 F.3d 657, 672 (7th Cir.2004).

█ Speech is a matter of public concern if it relates to a "political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir.2002). A court must consider the content, form and context of the speech, *id.* at 906–07, though content is the most important factor. *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974 (7th Cir.2000). "The speaker's motivation and choice of forum are [also] important because, absent those factors, every employment dispute involving a public agency could be considered a matter of public concern.'" *Wright v. Illinois Dept. of Children and Family Services*, 40 F.3d 1492, 1501 (7th Cir.1994) (quoting *Barkoo v. Melby*, 901 F.2d 613, 618 (7th Cir.1990)).

It is beyond dispute that substance abuse by emergency medical technicians is

a matter of public concern. *Sullivan v. Ramirez*, 360 F.3d 692, 699 (7th Cir.2004) (citing *Ohse v. Hughes*, 816 F.2d 1144, 1150–51 (7th Cir.1987), for proposition that allegations of alcohol consumption during business hours touched on matters of public concern); *Starrett v. Wadley*, 876 F.2d 808, 817 (10th Cir.1989) (complaints about supervisor's alcohol dependency are matter of public concern); *Jandro v. Foster*, 53 F.Supp.2d 1088, 1096 (D.Colo.1999) (concerns about district attorney's alcohol dependence touch upon matter of public concern). Defendants appear to concede this as a general principal. *See* Br. of Dfts. Olson and Anderson, dkt. # 36, at 9; Br. of Dfts. Kuhl et al., dkt. # 66, at 4–5. They argue, however, that even when speech relates to a matter of concern to the public, it is not entitled to protection under the First Amendment when it is made entirely as part of the employees' job duties. In support of their argument, defendant cite *Gonzalez v. City of Chicago*, 239 F.3d 939, 942 (7th Cir.2001), in which the court held that "[s]peech which is made in all respects as part of the employee's job duties is generally not the protected expression of the public employee." *See* Dft. MAS's Br., dkt. # 44, at 7, Br. of Dfts. Kuhl et al., dkt. # 38, at 12.

 Although plaintiff has not addressed defendants' challenge directly, I cannot grant defendants summary judgment on this basis. In *Delgado v. Jones*, 282 F.3d 511, 519 (7th Cir.2002), the Court of Appeals for the Seventh Circuit explained that the rule stated in *Gonzalez* applies only to speech that is part of an employee's *non-discretionary, routine* job duties. When the conduct in question goes "beyond some rote, routine discharge of an assigned duty," it may be entitled to First Amendment protection. *Id.* In *Delgado*, the court held that a city detective's disclosure of alleged criminal activities of a close

relative of an elected official could be protected speech even though it was the detective's job to investigate criminal activity. As the court emphasized, the plaintiff had "considerable discretion about how he communicated the information up the chain of command." *Id.* at 519. Similarly, plaintiff had a general responsibility to insure that the emergency medical technicians were not under the influence of drugs or alcohol while on duty. At the same time, he had some discretion in determining how to go about achieving this objective. Plaintiff's decision to terminate Gaetz cannot be characterized as a rote execution of an assigned duty.

Defendants also cite *Bartley v. Thompson*, 198 Wis.2d 323, 339–40, 542 N.W.2d 227, 233–34 (Ct.App.1995), in which the Wisconsin Court of Appeals held that the First Amendment offered no protection to the votes of a former member of the state Tax Appeals Commission in certain large income tax refund cases because it was his job to vote in these appeals. Although this holding relied on cases from the Court of Appeals for the Seventh Circuit preceding *Delgado*, it is consistent with the limitation articulated in *Delgado*. As the court noted, "it was [the plaintiff's] job to participate in the decision of cases coming before the commission and, when assigned to do so, to write opinions announcing the decisions." *Bartley*, 198 Wis.2d at 340, 542 N.W.2d at 233. Plaintiff was not comparable to Bartley. He was not required to terminate Gaetz, whereas Bartley was required to cast votes and write opinions.

Defendant MAS also argues that considerations of form and context reveal that plaintiff's termination of Gaetz is not entitled to First Amendment protection. Defendant contends that "[t]he form of plaintiff's alleged free speech was ... conduct in disciplining two MAS employees, rather than actual speech" and that plaintiff's mo-

tivation was to maintain his managerial power and control. Dft. MAS's Br., dkt. # 44, at 8–9. Defendant MAS has not provided any legal authority for the proposition that as a general matter, words speak louder than actions. It is true that in some instances, the communicative import in certain actions might not be particularly apparent. However, it is clear that when plaintiff terminated Gaetz, he expressed the gravity of his concern that emergency medical technicians might respond to calls under the influence of drugs or alcohol. Plaintiff terminated Gaetz at an intervention in response to Gaetz's refusal to enter an in-patient treatment program. In the letters plaintiff sent to the board members and to Gaetz, plaintiff referred to Gaetz's refusal to submit to testing when plaintiff suspected that he was under the influence of drugs or alcohol and his refusal to seek the treatment that plaintiff recommended.

 With respect to defendant MAS's assertion that plaintiff's purpose for terminating Gaetz was to exercise and affirm his managerial control over MAS employees, ample evidence suggests that his motive was to insure that emergency medical service was not being provided by persons under the influence of any intoxicating substance. Plaintiff had been objecting to the zero intoxication policy of the Amery Fire Department as overly lenient and advocating the adoption of a zero tolerance policy in its place for approximately four years before terminating Gaetz. In any event, motive is relevant but not dispositive. *Wainscott v. Henry,* 315 F.3d 844, 849 (7th Cir.2003); *Breuer v. Hart,* 909 F.2d 1035, 1039 (7th Cir.1990) ("Wrongdoing may often be revealed to the proper authorities only by those who have some personal stake in exposing wrongdoing."). Balancing considerations of content, form and context, the issue of on-duty intoxi-

cation is of such a degree of importance to the public that it outweighs any personal motive plaintiff might have had in asserting control over Gaetz. *Cf. Gustafson,* 290 F.3d at 907 (when issue such as allocation of police patrols is of such " 'serious public import,' " it deserves " 'a full airing in the public marketplace of ideas and opinions' ") (quoting *Campbell v. Towse,* 99 F.3d 820, 828 (7th Cir.1996)). Accordingly, I conclude that plaintiff's termination of Gaetz satisfies the public concern prong of the *Connick–Pickering* framework. However, as noted below, it is unnecessary to analyze plaintiff's speech under the second prong of the test; plaintiff has failed to show that it was a motivating factor in defendant's decision and for that reason, has not made out a prima facie case.

### 4. *Motivating factor*

 The second element of a prima facie case of First Amendment retaliation is a showing that the speech was one of the reasons for the employer's actions. *Spiegla,* 371 F.3d at 935; *Gustafson,* 290 F.3d at 906. This is where plaintiff's claim fails. First, plaintiff has not even tried to explain why or how the evidence satisfies the causation element. Some defendants had assumed that the alleged retaliatory conduct was the board's decision to suspend plaintiff until the next board meeting. Plaintiff responded to these arguments by making it clear that the alleged retaliatory conduct was the decision to hold the meeting in open session, not the suspension decision. *See* Plt.'s Br., dkt. # 54, at 25–26. In this section of his brief, however, plaintiff does not even mention Gaetz's termination or assert that it motivated defendants' decision, let alone explain how and what evidence might support such an assertion.

The closest plaintiff comes to making an argument with respect to the causation requirement is his general assertion that

**658**

"the Board took pains to ask Van Blaricom and Gaetz whether *they* would prefer to have personnel issues relating to them considered in closed session. That same courtesy was not extended to Framsted." Plt.'s Br., dkt. # 54, at 26. However, this assertion is not supported by the meeting transcript on which plaintiff relies. *See* Plt.'s PFOF, dkt. # 56, at 12, ¶ 37. The relevant portion of the transcript provides as follows:

> Sollman: OK. And its, I think all parties should agree then that it should be open. Otherwise it probably should be closed.
>
> Kuhl: Let's start it as open. We always (inaudible) go to a closed if the board deems necessary. Cuz this is an emergency meeting and a lot of the old rules do not apply. It's something that's gotta be done and its gotta be done quickly. Lee, you've been running the thing for the last three weeks, ah I kinda stepped out because I had things to do. They had me running here and running there and I wasn't getting none of it done properly. So Lee is inherited ah vice-chair and he's been working with it. Lee, you want to tell us something?
>
> Olson: Oh ... Monday Rick Van Blaricom was dismissed from the service, Ben was dismissed today ...
>
> Framsted: Suspended.
>
> Olson: Suspended today. The reasons, I don't know if I should, am I allowed to go into the reasons if it's ...
>
> Framsted: If it's personell ... if it's personell, no.
>
> Gaetz: (Inaudible) allowed to say anything you wish about me.
>
> Van Blaricom: And me.

Gilligan Aff., dkt. # 40, exh. HH, at 1. Defendant Olson asked whether he was "allowed" to speak on this matter in open session, not whether Gaetz or defendant Van Blaricom preferred open or closed session; plaintiff's response confirms this. Even if Gaetz and defendant Van Blaricom had said that they wanted the meeting to be held in closed session, a majority of the board would have had to vote in favor of closing the meeting. Wis. Stat. § 19.85(1). Thus, it is not clear that Gaetz and Van Blaricom would have actually been treated differently even if they had not volunteered their consent to the open meeting.

Plaintiff's failure to articulate a theory connecting his termination of Gaetz in August to defendant Kuhl's decision to hold the first part of the October 23 meeting initially in open session is hardly surprising given the scarcity of supporting evidence. There is no evidence that any defendant held plaintiff's termination of Gaetz against plaintiff; although the board voted to reinstate Gaetz, it did so in light of certain extenuating circumstances that the board acknowledged plaintiff may not have been aware of when he terminated Gaetz and only after asking plaintiff what he thought about reinstatement. There is no evidence that any board member criticized plaintiff or had reason to doubt his intentions in terminating Gaetz. There is no evidence that plaintiff's prior effort in cracking down on potential intoxication by firefighters had not been well-received. Finally, plaintiff had terminated Gaetz approximately two and a half months before the meeting was held. *See Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001) ("As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy.").

Plaintiff would have a difficult time showing retaliatory animus with respect to any defendant individually. Defendants Wright and Schmidt were not even at the pre-meeting where plaintiff expressed his

desire that the meeting be held in closed session. Of the remaining defendants, only Sollman and Kuhl ever expressed the opinion that the meeting ought to be closed. Although defendant Sollman had been adamant at the pre-meeting that the session be open, the opinion he expressed at the actual meeting was that it ought to be closed unless everyone agreed on having it open.

■ Defendant Kuhl made the decision to hold the meeting in open session. However, he made it clear that the meeting would be closed if and when the board deemed it appropriate. He opened the meeting by asking everyone present to refrain from making personal attacks. Later when some of the employee letters were being read, he suggested that the meeting be converted to closed session. It was Gaetz, not one of the board members, who objected to this suggestion. Defendant Kuhl decided that the meeting could continue in open session but only after the employee complaint at issue was described as relating to bookkeeping and after defendant Kuhl had said to delete certain parts of the complaint. Finally, Wisconsin's open meetings laws create a general presumption that meetings be held in open session with exceptions that are to be narrowly construed. Wis. Stat. §§ 19.83(1) ("Every meeting of a governmental body ... *shall* be held in open session") (emphasis added) and 19.85 (exceptions under which closed session *may* be held); *State ex rel. Hodge v. Town of Turtle Lake*, 180 Wis.2d 62, 71, 508 N.W.2d 603, 606 (1993) (exceptions to Wisconsin open meeting laws should be strictly construed). In light of the foregoing, there is no evidence from which to infer that the decision to hold the meeting in open session was intended to embarrass or degrade plaintiff.

It was plaintiff's burden to adduce evidence from which a jury could find that his termination of Gaetz in August 2003 was a motivating reason for defendants' decision to hold the MAS board of directors meeting of October 23, 2002 in open session. He has not met this burden. Therefore, he cannot make out a prima facie case of retaliation. Because plaintiff has failed to meet this burden, it is unnecessary to address defendants' argument that their interest in efficiently providing public services outweighs plaintiff's First Amendment interest.

### B. *Wrongful Termination*

■ In count two of his complaint, plaintiff alleges that defendants wrongfully terminated him. Plaintiff contends that the decision to hold the first half of the October 23 meeting in open session violated Wisconsin's open meeting laws and caused him to be constructively discharged. Plt.'s Cpt., dkt. # 36, at 18, ¶¶ 69–71. A constructive discharge occurs when an employee quits because the working conditions have become so intolerable that a reasonable person in her position would be impelled to resign. *Strozinsky v. School Dist. Brown Deer*, 2000 WI 97, ¶ 76, 237 Wis.2d 19, 614 N.W.2d 443; *Goggins v. Rogers Memorial Hospital Inc.*, 2004 WI App 113, ¶ 25, 274 Wis.2d 754, 683 N.W.2d 510,. Had the meeting been held in closed session, everyone with whom plaintiff works on a regular basis would have heard the accusations. Thus, it appears to be plaintiff's theory that his working conditions were drastically altered because people with whom he does not regularly work might have heard the accusations. Notwithstanding the specious nature of this theory on constructive discharge, the claim rests on a mischaracterization of Wisconsin wrongful termination law.

■ Wisconsin adheres to the employment-at-will doctrine, which provides that when the terms of employment are indefinite, an employer may discharge an

employee "for good cause, for no cause or for a cause morally wrong" without legal consequence. *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 567, 335 N.W.2d 834, 837 (1983). However, there is a narrow public policy exception "that allows at-will employees to sue for wrongful discharge if they are fired for fulfilling, or refusing to violate, a fundamental, well-defined public policy or an affirmative legal obligation established by existing law." *Bammert v. Don's Super Valu, Inc.*, 2002 WI 85, ¶ 3, 254 Wis.2d 347, 646 N.W.2d 365. There are two obvious defects in plaintiff's claim. First, plaintiff does not argue that he was terminated for fulfilling an obligation under the open meetings laws or for refusing to violate the law. Second, as defendants have noted and plaintiff has conceded, defendants did not violate Wisconsin's open meetings laws by holding the October 23 meeting in open session. The law provides a broad requirement that meetings of governmental entities be held in open session, Wis. Stat. § 19.83; exceptions to this rule are discretionary and are to be narrowly construed, *State ex rel. Hodge*, 180 Wis.2d at 71, 508 N.W.2d at 606. Employees have the right to have personnel hearings held in open session but have no correlative right to insist upon a closed session. Wis. Stat. § 19.85(1)(b). Plaintiff has not advanced any argument in response to defendants' challenges on these two issues. Accordingly, defendants' motions will be granted with respect to plaintiff's wrongful termination claim.

## C. *Defamation*

### 1. *Defendant Bjornson*

 Plaintiff's third claim is that defendant Bjornson defamed him by suggesting that he had introduced the D–50 into the saline bag and by making the following statement: "Chris I guess if enough people are telling you that you are a[rat], look around to see if you have a tail." "The elements of a defamation claim are: (1) a false statement, (2) communicated by speech, conduct, or in writing to a person other than the person defamed, and (3) the communication is unprivileged and is defamatory, that is, it tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her." *Hart v. Bennet*, 2003 WI App 231, ¶ 21, 267 Wis.2d 919, 672 N.W.2d 306. According to defendants, plaintiff's claim must fail because (1) defendant Bjornson's statements are not capable of being proved true or false; they are non-actionable figures of speech; (2) the comment is entitled to conditional privilege because it was made at a public meeting and relevant to the discussion; and (3) plaintiff is a public figure and has failed to show that defendant Bjornson acted with malice.

### a. *Incapable of being proved false*

 With respect to the argument that defendant Bjornson's statements are incapable of being proved true or false, plaintiff cites the following apt passage from *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir.1996):

> If you say simply that a person is a "rat," you are not saying something definite enough to allow a jury to determine whether what you are saying is true or false. If you say he is a rat because ..., whether you are defaming him depends on what you say in the because clause."

The "because clause" of defendant Bjornson's rat comment was that there were a number of people criticizing plaintiff. This is indisputedly true. Although it was implicit in defendant Bjornson's statement that certain statements of others might be correct, *Mach v. Allison*, 2003 WI App. 11,

¶ 12, 259 Wis.2d 686, 688–89, 656 N.W.2d 766, 772 (defamatory statement need not be direct affirmation but may also be implicit), statements of opinions are actionable only where there is some suggestion that they are based on undisclosed defamatory facts. *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1268 (7th Cir.1996) ("a communication that blends an expression of opinion with an expression of fact is actionable in Wisconsin 'if it implies the assertion of undisclosed defamatory facts as a basis of the opinion'") (quoting Wis. JI—Civil 2500 at 2 (1993)); *see also Restatement (Second) of Torts* § 566. Viewed in its entirety, as in *Mach*, 2003 WI App 11, at ¶ 31, 259 Wis.2d 686, 656 N.W.2d 766 (court looks at context to determine whether language is capable of defamatory meaning), defendant Bjornson's statement does not suggest that he had some undisclosed objectively verifiable factual basis for believing the various allegations made about plaintiff. To the contrary, defendant Bjornson made it clear that the only basis for his opinion was the sheer number of people making the accusations.

This is not a case of republication in which defendant Bjornson might be held liable even if he expressed skepticism about the truth of the statements. *See Hart*, 2003 WI App. 231, at ¶ 27, 267 Wis.2d 919, 672 N.W.2d 306. Defendant Bjornson did not repeat any of the statements to which he referred. Plaintiff appears to be arguing that defendant Bjornson republished Gaetz's accusations regarding the D–50 incident because he "adopted unquestioningly Gaetz's version of events." Plt.'s Br., dkt. # 54, at 31. First, defendant Bjornson said only that he doubted plaintiff had the authority to decide when to administer D–50; he did not repeat Gaetz's accusation that plaintiff did administer D–50 on a particular occasion. Moreover, defendant Bjornson

was asked to provide commentary about "the seriousness of the intra veinious [sic] that Chris started." Gilligan aff., dkt. # 40, exh. HH. Bjornson could not answer the question without assuming that plaintiff introduced the D–50. Under the circumstances, any implication that the allegations were true could hardly be attributed to defendant Bjornson.

b. *Conditional privilege*

■ Statements may be conditionally privileged when they are made in furtherance of some interest of societal importance. *Vultaggio v. Yasko*, 215 Wis.2d 326, 330, 572 N.W.2d 450, 452 (1998). In response to defendants' argument that defendant Bjornson's statement is entitled to a conditional privilege because it was made at a public meeting and was relevant to the discussion, plaintiff asserts that "[n]o possible 'interest of societal importance' was furthered by the 'Framsted lynching.'" Plt.'s Br., dkt. # 54, at 32. There is no merit to this argument; the continued operation of defendant MAS is clearly of societal importance.

■ Wisconsin courts recognize that testimony given at town board meetings and city councils is entitled to at least a conditional privilege. *Vultaggio*, 215 Wis.2d 326, 572 N.W.2d 450 (city council); *DiMiceli v. Klieger*, 58 Wis.2d 359, 206 N.W.2d 184 (1973) (town board meeting) (citing *Werner v. Ascher*, 86 Wis. 349, 56 N.W. 869 (1893)). Although this privilege does not apply to meetings of clearly private bodies, *DiMiceli*, 58 Wis.2d at 365–66, 206 N.W.2d 184 (executive committee of private hospital not a "quasi-judicial body"), defendant MAS is a quasi-governmental entity.

Plaintiff lays out a number of circumstances in which Wisconsin courts have recognized an abuse of a conditional privi-

lege, but does not indicate which one he believes applies in this case. Plaintiff's failure to identify which one applies or even assert that one applies constitutes waiver of his argument. *Central States, Southeast and Southwest Areas Pension Fund,* 181 F.3d at 808; *see also Zinda v. Louisiana Pacific Corp.,* 149 Wis.2d 913, 926, 440 N.W.2d 548, 553–54 (1989). Even if plaintiff had advanced an argument, it would not have made a difference; there are multiple grounds for granting defendants' motion on this claim.

### c. Limited purpose public figure

 Otherwise defamatory remarks about a public figure are privileged unless they were made with actual malice. *Torgerson v. Journal/Sentinel, Inc.,* 210 Wis.2d 524, 535–36, 563 N.W.2d 472, 481 (1997). "There are generally two ways to obtain the label 'public figure': (1) a person may receive the label for all purposes due to general fame or notoriety; or (2) a person may become a public figure for a limited purpose because of involvement in a particular public issue or controversy." *Maguire v. Journal Sentinel, Inc.,* 232 Wis.2d 236, 243, 605 N.W.2d 881, 886 (Ct. App.1999). The parties dispute whether plaintiff was a limited purpose public figure. In determining whether a person qualifies, Wisconsin courts apply a three part test: "(1) [is] the plaintiff is involved in a public controversy; (2)[is] the plaintiff's role in the controversy more than trivial or tangential; and (3)[is] the alleged defamation [ ] germane to the plaintiff's participation in the controversy." *Id.* at 243, 605 N.W.2d at 886. Whether a person is a public figure is a question of law. *Lewis v. Coursolle Broadcasting of Wis., Inc.,* 127 Wis.2d 105, 111, 377 N.W.2d 166, 168 (1985).

The latter two requirements seem easily satisfied in this case. Certainly, plaintiff's role in the controversy was more than tangential; plaintiff and his interactions with other MAS employees were the focus of the meeting. In addition, defendant Bjornson's comments were clearly germane to the issue at hand; his comments related to the seriousness of one of the charges brought against plaintiff and about the disabling effect of the friction between plaintiff and the employees whom he managed.

 Accordingly, the issue is whether the dispute involved a public controversy. Wisconsin courts hold that "[a] public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way . . . . [E]ssentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Maguire,* 232 Wis.2d at 245, 605 N.W.2d at 887 (Ct.App.1999) (citing *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1297 (D.C.Cir.1980)). Relying on this standard, I conclude that there was a public controversy in this case. The potential ramification of the meeting was disruption to the provision of ambulance service in the area and plaintiff's financial management of defendant MAS.

Plaintiff argues that the meeting did not involve a public controversy because defendant Sollman's purpose in holding the meeting was to oust plaintiff. In support of this conclusion regarding defendant Sollman's intent, plaintiff notes it was defendant MAS's general policy to discuss personnel matters in closed session. This argument misses the mark; plaintiff does not explain why the interests of the citizens of the member municipalities are any

less affected because the speech may have been improperly motivated.

 Because plaintiff qualifies as a limited purpose public figure under the circumstances, he cannot succeed on his defamation claim unless he proves that defendant Bjornson acted with malice. *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis.2d at 535–36, 563 N.W.2d at 481. Although plaintiff makes bald assertions of malice, these statements lack evidentiary support. Actual malice is defined as knowledge that the statement was " 'false or [made] with reckless disregard of whether it was false or not.' " *Erdmann v. SF Broadcasting of Green Bay, Inc.*, 229 Wis.2d 156, 169, 599 N.W.2d 1, 7 (Ct. App.1999) (quoting *Denny v. Mertz*, 106 Wis.2d 636, 643, 318 N.W.2d 141, 144 (1982)). Defendant Bjornson was asked to comment on the seriousness of the D–50 charges; under this circumstance, defendant Bjornson can hardly be characterized as reckless for basing his answer on an assumption that the allegation is true. With respect to his later statement regarding the number of charges leveled against plaintiff, defendant Bjornson premised his comments with the phrase, "if these allegations are correct." Far from acting recklessly, defendant Bjornson acted with a cautious respect for the truth and openly acknowledged the tentative nature of his comments.

## 2. *Defendant Sollman*

 Finally, plaintiff contends that defendant Sollman is liable in defamation for "his role in publishing, facilitating, enabling and condoning" the inappropriate statements that Stinnett accused him of making at a local football game, "which lent unwarranted 'credibility' and 'legitimacy' to those false charges." Cpt., dkt. # 36, at 19, ¶ 75. Again, the statement defendant Sollman made was:

Ah … oh, God I cannot … you have to hear this. You have to hear this, because this was made in public. (Reading from Stinnett's letter) "At one point we were sitting at a football game in the ambulance. We had a fourteen year old female Explorer with us, and as a young female walked by the ambulance, Chris said, Chris stated that she would look good" … I can't read this.

One of the elements of a prima facie case of defamation is that there be a communication of the allegedly false statement. Plaintiff has cited no legal authority for the novel idea that a person can be held liable for defamation by simply setting the stage for another's statement. Again, this is not a republication case, because defendant Sollman did not read the allegedly defamatory portion of the letter aloud.

Defendants reassert their argument that plaintiff is a limited purpose public figure and therefore, must prove that defendant Sollman acted with malice. I have already concluded that plaintiff is a limited purpose public figure under the circumstances. (The alleged statement is germane to plaintiff's participation in the controversy, satisfying the third element. Of course, the analysis is somewhat skewed because defendant Sollman did not actually make the statement, in any event, the statement he might have made relates to plaintiff's qualification to continue serving as the MAS manager.) Plaintiff's general assertions of malice are unsupported by any evidence suggesting that defendant Sollman knew or had reason to know that Stinnett's allegations were false. Because plaintiff has failed to show that defendant Sollman satisfied the communication element of a prima facie case or that he acted with malice, defendant Sollman is entitled to summary judgment.

## ORDER

IT IS ORDERED that the motions for summary judgment of defendants Municipal Ambulance Service, Inc., Wilfred Kuhl, Lee Olson, Eugene A. Sollman, David Waterman, Michael Kruschak, Jr., Jim Schmidt, Glen Wright, Jerome Anderson, Richard Van Blaricom, Ken Galewyrick and Rolf Bjornson on plaintiff Chris Framsted's claims that they retaliated against him for exercising his rights under the First Amendment, wrongfully terminated him, and that defendants Bjornson and Sollman defamed him are GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.